Michael C. WOODEN, Dr. Terry Bratcher, Ruth Harris, Kirby Tracy, Tom Jarvis, Ashley Davis and Craig Greene, Plaintiffs,

v.

BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA and Dr. Stephen R. Portch, in his individual and official capacities, Defendants,

and

Georgia State Conference NAACP, et al., Intervenor Defendants.

No. CV 497–45.

United States District Court, S.D. Georgia, Savannah Division.

Jan. 6, 1999.

A. Lee Parks, Matthew C. Billips, K. Lee Adams, Kirwan, Parks, Chesin & Miller, P.C., Atlanta, GA, for Michael C. Wooden, Dr. Terry Bratcher, Elizabeth Scarbrough, Thelma F. Richardson, Marie McConnell, Ruth Harris, Kirby Tracy, Tom Jarvis, Ashley Davis, plaintiffs.

Dennis R. Dunn, Alfred L. Evans, Jr., Sr. Asst. Atty. Gen., Atlanta, GA, for Board of Regents of the University System of Georgia, Dr. Stephen R. Portch, defendants.

John Mell Clark, Elberton, GA, Howard Eugene Alls, Howard E. Alls & Associates, P.C., Savannah, GA, E. Ronald Garnett, Augusta, GA, Dennis D. Parker, David T. Goldberg, Victor A. Bolden, Theodore M. Shaw, NAACP Legal Defense & Educational Fund, Inc., New York, NY, Ivory Kenneth Dious, Kenneth Dious & Assoc., Athens, GA, for Georgia State Conference NAACP, Southern Christian Leadership Conference, Neshanta Johnson by and through Deborah Fanning, Adante Kwakye by and through Samuel Kwakye, Natalie Plowden by and through Nathaniel Plowden, Nicole Sheats by and through Alvin Sheats, Travis Thornton by and through Ovita Thornton, La'Dreca Wells by and through Larry Wakefield, Miranda Wilson by and through Larie Wilson, Kennita Bell, Chadafi Betterson, Lauretha Butler, William Deale, Tracey Ford, Derrick Gervin, Valerie Warren, Nyodemar Wiley, Caron Yancey, intervenor-defendants.

## ORDER

EDENFIELD, District Judge.

### I. INTRODUCTION

Invoking 42 U.S.C. §§ 1981, 1983 and 2000(d) ("Title VI"), plaintiffs Michael C. Wooden, et al., constitutionally challenge alleged racial discrimination within Georgia's University System. They insist that the defendant Board of Regents of the University System of Georgia (the Board) and co-defendant Dr. Stephen R. Portch have utilized a racially discriminatory admission policy at the University of Georgia (UGA). Such conduct, they further allege, has also continued past system-wide segregation. All parties have moved for summary judgment.

Plaintiffs advance a "two-prong" attack. The first involves a focused challenge to UGA's freshman admission policies. Specifically, Kirby Tracy and Ashley Davis, both white, contend that defendants denied them admission to UGA by applying race-based "affirmative action" admission policies, in violation of their Fourteenth Amendment equal protection rights.

The second encompasses a broader attack upon policies affecting the State's historically black institutions (HBIs). Because the issues involved in both prongs for the most part are analytically distinct, the Court will reach only "prong one" here, and "prong two" at a later time.

The Court is compelled to note, however, that both prongs are encased by an implacable polemic. For decades governments have

taken "affirmative action" to further minority representation in education and employment. That has generated intense debate over both its justification and constitutionality. *See Univ. of Cal. Regents v. Bakke,* 438 U.S. 265, 288 n. 25, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); Morris Abrams, *Affirmative Action: Fair Shakers and Social Engineers,* 99 Harv. L.Rev. 1312 (1986).

Affirmative action proponents claim no panacea, but argue that on both philosophical and empirical grounds such programs do more good than harm.[1] Opponents claim the opposite. Complaining of "reverse racism," they variously reason that affirmative action (a) unfairly brands merits-based achievers with a stigmatizing inferiority label; (b) causes social divisiveness costs which far outweigh any projected or actual benefit; and (c) creates a system of government-distributed preferences based on skin color—itself an invidious practice—which in turn fosters minority group dependence on government, rather than personal achievement.[2]

This Court's authority is limited to reaching only the underlying constitutional issues presented to it. This opinion, then, extends so far as is necessary to fulfill the federal judiciary's sole mission: to uphold the rights of individuals who are concretely impacted by government action. *See Missouri v. Jenkins,* 515 U.S. 70, 120–21, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995) (Thomas, J., conc.) ("At the heart of this interpretation of the Equal Protection Clause lies the principle that the Government must treat citizens as individuals, and not as members of racial, ethnic or religious groups").

## II. *BACKGROUND*

### A. Procedural Background

Plaintiffs filed this case in March of 1997. Doc. # 1. Portch and the Board answered and unsuccessfully sought F.R.Civ.P.12(b)(1)

& (6) dismissal of all claims. Doc.è10, 11, 47. In the meantime, the Georgia conference of the NAACP (NAACP) and others successfully moved to intervene under F.R.Civ.P. 24. Doc.è24, 46.

In addition to plaintiffs' motion for class certification, (doc. # 53), the Court (on their "prong one" claim) also must reach plaintiff Kirby Tracy's motion for partial summary judgment and plaintiff Ashley Davis's motion to amend her Complaint. Doc.è77, 73. In the meantime, the intervenors (hereafter for convenience, the NAACP) move for summary judgment against Tracy and Davis, doc.è87, 98, while the Board moves for summary judgment against all plaintiffs. Doc. # 115.

### B. Factual Background

UGA is the flagship institution of Georgia's University System. Admission to UGA is competitive; applications easily exceed available freshman seats. Albright dep. at 98. To assemble "the best class," the faculty admission committee, in conjunction with the admissions office, recommends a freshman admission policy each year. Albright dep. at 11, 14, 65–66, 80. This policy is formally presented to UGA's president for his approval, then implemented by the admissions office. *Id.;* Doc. # 125, exh. D. (UGA Admission Policy 1989–90). In that the contents and intent of these policies are challenged here, the Court will pause to describe them.

### 1. *1990—1995*

Between 1990–1995, UGA's freshman admissions policy applied objective academic criteria differently, depending upon whether an applicant was characterized as "black" or "non-black." Doc. # 125, exh. D.; Albright dep. at 10–15. The policy initially divided incoming applications into "first notice" or "final notice" categories. Albright dep. at 13.

---

1. *See* B.L. Hooks, *Affirmative Action: A Needed Remedy,* 21 Ga. L.Rev. 1043 (1987); L. Wightman, *The Threat to Diversity in Legal Education,* 72 N.Y.U.L.Rev. 1 (1997); W.G. Bowen & D.C. Bok, *The Shape of the River: Long-term Consequences of Considering Race in College and University Admissions* (Princeton Univ. Pr.1998).

2. *See* D. D'Souza, *Improving Culture to End Racism,* 19 Harv. J.L. & Pub. Pol'y 785 (1997); D. D'Souza, *The End of Racism* 545 (Simon & Schuster 1995) ("America will never liberate itself from the shackles of the past until the government gets out of the race business"; we need a "separation of race and State"); W. Brevard Hand, *Affirmative Action: La Mort De La Republique,* 48 Ala. L.Rev. 799 (1997).

First notice applicants had high Scholastic Aptitude Test (SAT) scores, high grade point averages (GPA) and a high academic index.[3] *Id.* Based upon minimum SAT, GPA and academic index standards set each Fall, applicants who met the first notice standard were offered admission shortly after the admissions-application deadline. *Id.*

UGA considered race by dual-tracking its admissions policy. *Id.* at 16. Thus, black applicants awarded first notice automatic admission into the Fall 1995 class were required to achieve, at a minimum, an 800 SAT score, a 2.0 GPA and a 2.0 academic index. Albright Aff., exh. A. In contrast, non-black applicants at the first notice level had to present higher minimum scores: 980 SAT, 2.5 GPA and a 2.4 academic index. *Id.*

Applicants who fell below the first notice standards proceeded on to the final notice stage. Albright dep. at 10. Before decisions were made on these applicants, UGA admissions personnel devised minimum standards which would fill out the freshman class according to enrollment needs (i.e. size, academic quality, racial diversity). Albright dep. at 12–14, 18–19.

Thus, blacks seeking admission to the Fall 1995 class at that stage had to produce the following minimum scores: (1) 350 on both the math and verbal sections of the SAT; (2) 800 total SAT score; (3) 2.0 GPA; and (4) 2.00 academic index. Albright Aff., exh. A. Non-blacks, on the other hand, had to present higher scores—a minimum 450 score on both the verbal and math portions of the SAT, an overall minimum SAT score of 980, a 2.5 GPA and a 2.4 academic index. *Id.*[4]

At both the first and final notice stages, then, UGA required less of black applicants than non-blacks. Such was the situation when plaintiff Kirby Tracy applied for admission to UGA's Fall 1995 Class. He presented a 3.47 GPA and an 830 SAT (480 math, 350 verbal). Because he did not meet the minimum SAT requirements for "non-blacks", UGA denied him admission under both the first and final notice criteria. Albright Aff., exh. A, ¶ 5. Yet, he undisputedly would have satisfied the "black" admissions criteria. Doc. # 86 ¶ 10.

Tracy thereafter matriculated at Georgia College (now Georgia College and State University). Albright Aff., exh. A ¶ 6. After two years there, he successfully applied to UGA as a 1997 transfer student, where he now remains. *Id.* at ¶ 7.

### 2. *1996—Present*

Concerned about the constitutionality of its dual-track admissions policy, UGA revised it for its 1996 freshman class. Albright dep. at 10; doc. # 86, ¶ 12. With some minor modifications, that policy remains in effect today. Albright dep. at 30–31.

Now UGA selects the majority (approximately 75% in 1996) of its freshman class strictly on the basis of objective academic criteria (i.e., through the computation of an academic index irrespective of each applicant's race). Albright dep. exh 2. Similar to UGA's 1990–95 policy, the index combines GPA with SAT scores to generate a numerical statistic—the academic index—that purports to predict an applicant's first year GPA. *Id.* at 94. At this initial stage UGA admits applicants whose academic index are above a certain number (2.6 for the 1996 freshman class) and who meet minimum SAT requirements. *Id.* at 30. But it does not consider race at this stage. *Id.* at 87.

From the remaining applications, UGA selects for "further evaluation" applicants whose academic indexes are above a certain number (2.3 for the 1996 freshman class) and who meet minimum SAT score requirements. *Id.* at 89–90. Applicants who fall below the minimum academic index or below the minimum SAT score requirement are not offered admission. *Id.* at 90–91. Race continues to

---

**3.** The academic index is a statistic computed for each applicant. The computation employs a regression analysis utilizing an individual's high school GPA and SAT scores. It attempts to predict, based upon comparison with past freshman classes, a prospective freshman's first year GPA. Albright dep. at 20–21.

**4.** Although the numbers tally up to be the same in both first and final notice stages for 1995, some variances were employed in prior years. *See* doc. # 86, exh. A.

be a non-factor at this point in the process. *Id.*

For those applicants selected for further evaluation, UGA calculates a Total Student Index (TSI). Albright dep., exh. 1. While TSI includes a combination of 15 weighted academic and demographic factors, "Ethnic Diversity" is the most heavily weighted demographic factor.[5] *Id.* It is only at this stage that UGA considers an applicant's race ("Ethnic Diversity"), and admits the remainder (25% in 1996) of its freshman class. Albright dep. at 89.

Plaintiff Ashley Davis applied for admission to the 1996 Fall freshman class at UGA. She had a 980 SAT, a 2.94 GPA, and a 2.21 academic index. *Id.* at 90; Davis dep. at 10. Because her academic index was below a 2.3, UGA computed no TSI for her and thus denied her application. *Id.* She subsequently enrolled in the Fall of 1996 as a freshman at the University of Tennessee, where she remains as an undergraduate. Davis dep. at 7. She has since disclaimed any interest in transferring to UGA. *Id.*

## III. *ANALYSIS*

### A. Standing and Mootness

As a threshold matter, both the Board and the NAACP challenge Tracy and Davis on standing and mootness grounds. They argue that since UGA never considered Davis's race in denying her application, she has no standing to challenge UGA's admission policy. As for Tracy, UGA mooted his claim by voluntarily terminating its 1990–95 admission policy and by admitting him as a transfer student.

■ A plaintiff in this context establishes standing by showing, first, that he has "suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife,* 504 U.S. 555,

560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotations and citations omitted). He must also demonstrate a "causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant." *Id.* Finally, "it must be likely, as opposed to merely speculative that the injury will be redressed by a favorable decision." *Id.*

■ In contrast, individuals with merely "a generalized grievance against allegedly illegal government conduct" lack standing to sue in federal court. *U.S. v. Hays,* 515 U.S. 737, 743, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995). Thus, in the equal protection context, standing exists only for "those persons who are personally denied equal treatment by the challenged discriminatory conduct." *Allen v. Wright,* 468 U.S. 737, 755, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (internal quotations and citations omitted); *accord Wilson v. Glenwood Intermountain Properties, Inc.,* 98 F.3d 590, 593 (10th Cir.1996) ("a person who fails to satisfy lawful, nondiscriminatory requirements or qualifications for the benefit lacks standing to raise claims of discrimination in the denial of the benefit").

■ Under these standards, Davis lacks standing to challenge the admissions policy as applied to her. The record shows that UGA denied her application solely upon her grades and test scores, not on her race or gender. She has failed to point to any competent record evidence showing that UGA considered her race when it rejected her. *Compare Patray v. State of Georgia,* C.A. No. 96–CV–104 (DF) (M.D.Ga.4/2/98) (unpublished) (doc. # 124, exh. A) (no standing where applicant denied admission based solely on objective academic criteria and presented no race or gender consideration evidence) *with Lesage v. State of Texas,* 158 F.3d 213, 220–22 (5th Cir.1998) (reversing summary judgment because of testimonial conflict over when race factored into admission process).

5. The 15 factors utilized in 1996 were as follows: Academic Index; High SAT Scores; Very High GPA; Advanced High School Courses; Georgia Residency; Non–Metro Area Residency; South Georgia Residency; Gender; Ethnic Diversity; Extracurricular Activities; Summer employment status; School year employment; Parent/Sibling Alumni; Adverse recommendation; and First generation college graduate. Albright dep., exh. 1. UGA has dropped several factors since it devised the TSI in 1996, but Ethnic Diversity remains. *Id.* at 31.

Davis relies upon the testimony of Dr. John Albright, UGA's senior associate director of admissions, concerning the establishment of the minimum academic index. Doc. # 138 ¶¶ 5, 7. However, Albright testified that he provided to the faculty admission committee only projected demographic information (including racial characteristics) about the group of applicants likely to be affected by UGA's minimum academic index. Albright dep. at 28–29, 48, 61–63, 108–109. In contrast, the minimum academic index—which Davis failed to meet—was based solely on objective academic criteria.

Davis next contends that the committee which set the minimum academic index requirement improperly took race into account since it knew of the applicant pool's demographics at that stage of the admissions process. For this argument to work, however, one must connect the committee's mere knowledge of an applicant pool's demographic characteristics to an impermissible racial classification. Except in a vague, cosmic sense, Davis fails to do that here.

Race simply was not a factor in the actual denial of Davis's application. Had a black applicant presented the same GPA and test scores, the result—denial of admission—would have been the same. Albright dep. at 109. UGA computed and applied its academic index for each applicant without regard to race, gender or any other demographic factor. *Id.* at 96–97. Furthermore, the allegedly illegal use of race as one of 15 TSI factors did not apply to Davis simply because she did not make it to the TSI applicant pool. *Id.*

Thus, while Davis may have suffered an injury (denial of admission to UGA), she has failed to show a causal connection between that injury and the affirmative action policy she assails. Because UGA denied her application based on objective criteria alone, without regard to her race,[6] she has no standing to challenge its admissions policy. The Court therefore must grant summary judgment to the defendants on all of Davis's claims.[7]

Defendants contend that Tracy's claim has been mooted in two ways. First, they point to UGA's 1996 termination of the 1990–95 dual track admission policy that UGA initially applied to him. Doc. # 72 at 5. Defendants assure the Court that this policy will never be resurrected *Id.* Second, Tracy's 1997 "transfer" admission neutralizes any initial dose of racial discrimination that UGA administered to him. *Id.* at 6; Albright Aff. at ¶¶ 7–9. These developments, defendants argue, prevent this Court from affording any meaningful remedy to Tracy now.

■ Mootness is analogous to a continuing standing requirement. "The requisite personal interest that must exist at the commencement of the litigation (standing) must continue through its existence (mootness)." H. Monaghan, *Constitutional Adjudication: The Who and When,* 82 Yale L.J. 1363, 1364 (1973). Hence, "[f]ederal courts are without power to decide questions that cannot affect the rights of litigants in the case before them." *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971); *Brooks v. Georgia St. Board of Elections,* 59 F.3d 1114, 1121 (11th Cir.1995).

■ UGA's voluntary cessation of its 1990–95, dual track admission policy does not necessarily moot Tracy's claim for relief. *See U.S. v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) ("voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the

---

6. Davis's interest in representing a class of other denied applicants does not save the day. *See Lewis v. Casey,* 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) ("[t]hat a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that the injury has been suffered by other, unidentified members of the class to which they belong and purport to represent").

7. Also pending before this Court is Davis's Motion to Amend her Complaint to include a gender discrimination claim. Doc. # 73. Like race, gender was used as a factor in computing the TSI, with males applicants given an advantage. Albright dep. at 57–58. However, since UGA computed no TSI for Davis, this claim also must fail. Accordingly, her motion to amend her Complaint must be denied as moot.

case moot"); *DeFunis v. Odegaard,* 416 U.S. 312, 318, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) (reasoning, in a challenged admission procedure case, that a defendant's voluntary cessation would moot the case only if "there is no reasonable expectation that the wrong would be repeated"; "[o]therwise, the defendant is free to return to his old ways and this fact would be enough to prevent mootness because of the public interest in having the legality of the practice settled").

Here Chancellor Portch has announced his intent to continue using race as a factor in admissions until otherwise directed by a court order. Portch dep. at 34–37. Likewise, UGA's senior associate director of admissions noted that nothing prevented UGA from returning to its 1990–95 admission policy. Albright dep. at 63. While the Board's counsel represents that UGA will not revive its pre–1996 dual track admission process, doc. # 81 at 4, this representation could be altered by any number of events (i.e., a change in University administration, change in Board policy, change in State Law). Therefore, Tracy's claim is not moot on these grounds.

■ There is still the question, however, whether Tracy has an available remedy. The Board is immune from liability for monetary (including nominal) damages under 42 U.S.C. § 1983 and § 1981. *Powell v. Dept. of Human Resources of State of Ga.,* 918 F.Supp. 1575, 1578 (S.D.Ga.1996), *aff'd,* 114 F.3d 1074 (11th Cir.1997). But Tracy may be able to impose Title VI monetary liability against the defendants for denying his application based upon impermissible racial discrimination. *See Cannon v. University of Chicago,* 441 U.S. 677, 703, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) ("We have no doubt that Congress ... understood Title VI as authorizing an implied private cause of action for victims of the prohibited discrimination");

*Franklin v. Gwinnett County Pub. Schools,* 503 U.S. 60, 70, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (noting the similarity of analysis between Title VI and Title IX, and concluding that a damages remedy is available under Title IX).

Relying upon *Gebser v. Lago Vista Independent School Dist.,* 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998), defendants contend that Tracy cannot recover Title VI damages because the Board had no knowledge of UGA's discriminatory admission policy. *Gebser* held that a student who was sexually harassed by a teacher could not recover from a school district under Title IX absent actual knowledge of the harassment or deliberate indifference by school board officials. *Id.* at 1998–99. Here the Board disavows any knowledge of UGA's allegedly discriminatory admission policy, citing the testimony of several members of the Board.

However, the former Chancellor of the Board—who retired in March of 1994—indicated that he *probably* knew of UGA's dual track admission policy while he was still Chancellor. Propst dep. at 65. Also, while Regent Elridge McMillian denied that he had any specific knowledge about UGA's admission policy, he believed that the Board's directive on *inclusion and opportunity* allocation in admissions signaled that institutions should take race into account for admission purposes. McMillian dep. at 32. He further testified that race has always been used for admission purposes. *Id.* at 41.[8] Finally, minutes of a 3/18/97 UGA Faculty Admission Committee meeting indicate that, with regard to affirmative action in admissions, it was operating under the directive of the Board of Regents, referring to letters from Chancellor Portch, Vice Chancellor Neeley and Chairman Allgood. Doc. # 125, exh. D. Hence, even under a strict reading of the

---

**8.** Q. All right. So if any of the institutions are using race as a factor in the admissions process you wouldn't be able to tell me why they're doing that?

A. I couldn't tell you why they're doing it if I don't know that they're doing it.

Q. Right. Right. Okay.

A. Parenthetically I hope they are. On the good side.

Q. Which side would that be?

·A. Fact of access. They use it, you know, you use it. *You always have used race as admissions.* You used it for 150 years to keep us out. That was using race. So what the heck. *It's always been a way of life.* (emphasis added).

*Gebser* notice requirement, the Board knew of UGA's admission policy.[9]

Additionally, *Gebser* supports the notion that knowledge of the admission policy by UGA's president satisfies Title VI's actual notice requirement. *Gebser* simply held that an appropriate person must have notice of the harassment. 118 S.Ct. at 1999 ("an appropriate person ... is, at a minimum, an official of the recipient entity with the authority to take corrective action to end the discrimination"). UGA's president had actual knowledge of the admission policy and had the authority to correct any discrimination through his veto power. Albright dep. at 59–61.

While the Board, not UGA, is the entity named as a defendant in this matter, UGA is also a recipient of federal funds. Albright dep. at 109–110. Only by quirk of State law did UGA escape being named as a defendant here. O.C.G.A. § 20–3–34 (only the Board, not public universities, can sue and be sued); *McCafferty v. Medical College of Georgia,* 249 Ga. 62, 69, 287 S.E.2d 171 (1982), *overruled on other grounds, Self v. City of Atlanta,* 259 Ga. 78, 79, 377 S.E.2d 674 (1989). *See also supra* note 9.

Tracy, however, has not been explicit in his demand for damages under Title VI. Indeed, in deposition he disclaimed any pursuit of monetary damages. Tracy dep. at 14. Nevertheless, he testified that he was upset that he was denied admission to UGA as a freshman. *Id.* And, the claim for money damages pleaded in his Complaint (doc. # 1 at 7; doc. # 43 ¶ 15) has not been withdrawn. Finally, he may be able to seek recompense for expenses incurred due to his failed original application and other damages stemming from his transfer from Georgia College to UGA. *See, e.g., Hopwood v. State of Texas,*

999 F.Supp. 872, 908 (W.D.Tex.1998) (awarding nominal damages of $1.00 and compensatory damages of $6000.00 for mental anguish stemming from law school's Title VI violation). While potential compensatory damages for any past Title VI violation may be small or even nominal, they cannot be said to be non-existent.

Thus, at least with respect to his claim for relief for past unconstitutional behavior, Tracy's claim is not moot. His status as a current student at UGA does not diminish or rectify the alleged constitutional injury caused by any impermissible use of race when UGA considered his original application. Accordingly, he may seek compensatory damages under Title VI.[10]

While Tracy's Title VI damages claim defeats at least part of defendants' mootness argument, his current UGA undergrad status suggests that his prospective injunctive relief claim may be moot. Some authority exists for the proposition that claims brought as a class action survive even when the putative name plaintiff's case is mooted *before* class certification. *See Robidoux v. Celani,* 987 F.2d 931, 938–39 (2nd Cir.1993) (In class action involving receipt of public benefits, fact that named plaintiffs received benefits after suit commenced but before certification did not moot case). The Court will resolve the injunctive-relief mootness question when it addresses the class certification issue in a forthcoming order.

**B. Constitutionality of UGA's 1990–95 Admission Policy**

■ Tracy's claim is before the Court on cross-motions for summary judgment. The Court applies the summary judgment standards exhaustively detailed in *Fitzpatrick v.*

---

**9.** Even though this evidence satisfies *Gebser*'s notice requirement, that case nevertheless is factually distinguishable from this case. In *Gebser,* an aberrant teacher engaged in an improper sexual relationship with a student, unbeknownst to any authority within the school or school district. Here UGA's dual track admission policy was recommended to UGA's president by the Faculty Admission Committee. Albright dep. at 11, 14, 65–66, 80. The president formally adopted the policy pursuant to the authority given to him by the Board of Regents. *Id.* It thus was an institutional policy in place for five years,

affecting thousands of UGA applicants, and not a random, unauthorized act (e.g., the sexual misconduct at issue in *Gebser* ) concealed from the institution itself.

**10.** Defendants cite this Court's 9/10/97 order (doc. # 47) as barring any claim for monetary damages. That Order merely observed that the Board was immune from monetary damages under §§ 1983 and 1981. It did not address Title VI liability.

*City of Atlanta,* 2 F.3d 1112, 1115–17 (11th Cir.1993) and *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742–43 (11th Cir.1996).

Tracy argues that UGA's admission policy discriminated against him because he was white. The Board admits that UGA's admission policy classified applicants as black or non-black, with black applicants receiving preferential treatment in admission decisions. Doc. #86, ¶23. Interestingly, the Board does not seek to litigate the constitutionality of this policy, but instead merely (and unsuccessfully, *see* part III(A) *supra*) insists that Tracy lacks standing to sue. *Id.* at ¶¶27, 28. The NAACP, however, defends the policy on the grounds that it was narrowly tailored to serve compelling State interests. Doc. #89, ¶¶27, 28.

Title VI of the Civil Rights Act of 1964 states that:

> No person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. 42 U.S.C. § 2000d.

Hence, to state a claim a Title VI plaintiff must allege that the entity involved is (1) receiving federal funds; and (2) engaging in racial discrimination. *Fobbs v. Holy Cross,* 29 F.3d 1439, 1447 (9th Cir.1994). The University System of Georgia and UGA, under the Board's control and direction, constitute "programs" within the definition of Title VI. *See* 42 U.S.C. § 2000d–4a(2)(A) (defining program to include "a college, university, or other postsecondary institutions, or a public system of higher education"). Likewise, UGA receives federal funds. Albright dep. at 109–110.

"Engaging in racial discrimination" proscribes only such racial classifications which violate the equal protection clause of the Fourteenth Amendment. *Bakke,* 438

U.S. 265, 287, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (Powell, J., conc.); *id.* at 328, 98 S.Ct. 2733 (Brennan, White, Marshall and Blackmun, JJ., conc.). The Board has admitted that UGA's dual track admission policy employed an outright racial classification. Because such classifications deny citizens their "'personal rights' to be treated with equal dignity and respect," they are inherently suspect, *Richmond v. J.A. Croson,* 488 U.S. 469, 493, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (O'Connor, J., conc.), warranting a "strict scrutiny" level of review. *Id.*

### 1. *Strict Scrutiny*

In reviewing the constitutionality of racial classifications, strict scrutiny is used "to 'smoke out' illegitimate uses of race." *Id.* This standard of review "is not dependent on the race of those burdened or benefitted in a particular classification." *Id.* at 494, 109 S.Ct. 706; *Bakke,* 438 U.S. at 289–290, 98 S.Ct. 2733 (Powell, J., conc.) ("the guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color").

In order for a racial classification to be upheld under the strict scrutiny standard, defendants must show that the policy in question (1) served a compelling government interest; and (2) was narrowly tailored to further such interest. *Wygant v. Jackson Board of Ed.,* 476 U.S. 267, 274, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). Here the Board does not contend that the use of race as a factor in the admissions process at UGA serves a compelling State interest. Doc. #86, ¶27. Nor has it argued that its use of race withstands strict scrutiny analysis. Doc. #86, ¶28. In contrast, the NAACP argues that the racial classification in question is justified by multiple compelling interests: remedying past racial discrimination and ensuring a diverse educational setting at UGA.[11] Doc. #89 ¶28.

---

11. The NAACP contends that the diversity and remedial interests undergirding UGA's admission policy are complementary and "mutually reinforcing." *Doc. #156 at 19 n. 15. This is not the case.* A diversity-based affirmative action program which benefits only one ethnic group is

fatally under inclusive. *Bakke,* 438 U.S. at 315, 98 S.Ct. 2733 (Powell, J., conc.) ("special admissions program [which] focused solely on ethnic diversity, would hinder rather that further attainment of genuine diversity"). Conversely, a remedial-based affirmative action program which

### 2. Interest in a Diverse Educational Setting

The NAACP maintains that UGA's dual track policy served a compelling government interest in fostering diversity at UGA. Doc. # 90 at 22–23. In effect, it argues that the State has an interest in promoting diversity by implementing an admission policy that prefers black applicants. This diversity rationale focuses not on remedying past discrimination, but rather on the benefit that accrues from an educational setting which includes diverse interests and viewpoints. *Id.*

Although the Court recognizes the theoretical benefits of an educational setting which is open to a diverse collection of viewpoints, it is not convinced that these benefits—furthered here only in an abstract sense—justify outright discriminatory admission practices which cause concrete constitutional injuries. At an abstract level, "few would gainsay the attractiveness of diversity." *Wessmann v. Gittens*, 160 F.3d 790, 797 (1st Cir.1998). However noble this general goal is, a court must scrutinize the specifics policies which seek to achieve diversity. "[A]n inquiring court cannot content itself with abstractions." *Id.* "[I]t would be cause for consternation were a court, without more, free to accept a term as malleable as 'diversity' in satisfaction of the compelling interest needed to justify governmentally-sponsored racial distinctions." *Id.* at 796.

Abstractions aimed at marginally increasing diversity simply cannot carry the day because such benefit is far outweighed by the stigmatizing, polarizing costs imposed by racial classifications. *See Croson*, 488 U.S. at 493, 109 S.Ct. 706 (O'Connor, J., conc.) ("Classifications based on race carry a danger of stigmatic harm"); *Fullilove v. Klutznick*, 448 U.S. 448, 533, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (Stewart, J., dissenting) (By allowing racial classifications, "[n]otions of 'racial entitlement' will be fostered, and private discrimination will necessarily be encouraged"). Beyond group-level harms are the real injuries suffered by innocent individuals, such as Tracy, who was prevented—solely on the basis of his skin color—from competing on equal footing for a spot in UGA's 1995 freshman class.

Justice Powell's concurring opinion in *Bakke* suggests that the goal of genuine diversity in an educational setting is a compelling government interest. *Bakke*, 438 U.S. at 311–15, 98 S.Ct. 2733. Though finding the actual admission policy at issue in *Bakke* unconstitutional on equal protection grounds, he suggested that a compelling interest existed for a State university to seek a "diverse student body". *Id.* at 312, 98 S.Ct. 2733. This part of the opinion, as has been pointed out by the parties, numerous commentators and other Courts, was not joined by any other Justice. Its precedential value is therefore questionable.

Concurring opinions of other Justices, however, also suggest that diversity can be a compelling government interest. *See Wygant* 476 U.S. at 286, 106 S.Ct. 1842 (O'Connor, J., conc.) ("a State interest in the promotion of racial diversity has been found sufficiently 'compelling,' at least in the context of higher education, to support the use of racial considerations in furthering that interest"); *Croson*, 488 U.S. at 511 n. 1, 109 S.Ct. 706 (Stevens, J., conc.) (citing Justice Powell's opinion in *Bakke* for the proposition that non-remedial racial classifications "may produce tangible and fully justified future benefits"); *but see Metro Broadcasting, Inc. v. FCC*, 497 U.S. 547, 614, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990) (O'Connor, J., dissenting) ("Like the vague assertion of societal discrimination, a claim of insufficiently diverse broadcasting viewpoints might be used to justify equally unconstrained racial preferences, linked to nothing other than proportional representation of various races").

Some lower courts have seized upon Justice Powell's diversity rationale in finding that diversity-driven preferential treatment of applicants according to race is a compelling government interest. *See Eisenberg v.*

---

benefits groups who are not the victims of present effects of past discrimination is fatally over inclusive. *Croson*, 488 U.S. at 506, 109 S.Ct. 706 ("The gross over inclusiveness of Richmond's racial preference strongly impugns the city's claim of remedial motivation"). As such, each interest must be treated as analytically distinct.

*Montgomery County Public Schools,* 19 F.Supp.2d. 449, 453 (D.Md.1998) (recognizing diversity as a compelling government interest); *Davis v. Halpern,* 768 F.Supp. 968, 975 (E.D.N.Y.1991) (classifications which "obtain[ ] the benefits which flow from enrolling an ethnically diverse student body" serve a compelling interest).

Other courts contend, for a number of reasons, that diversity is not a compelling government interest warranting racial classification. *See Hopwood v. State of Texas,* 78 F.3d 932, 944–48 (5th Cir.1996), *cert. denied,* 518 U.S. 1033, 116 S.Ct. 2580, 2581, 135 L.Ed.2d 1094, 1095 (1997) ("any consideration of race or ethnicity . . . in order to achieve a diverse student population is not a compelling interest under the Fourteenth Amendment"); *Lutheran Church—Missouri Synod v. FCC,* 141 F.3d 344, 354 (D.C.Cir. 1998) ("We do not think diversity can be elevated to the compelling level"); *Taxman v. Board of Educ. of Township of Piscataway,* 91 F.3d 1547, 1558–62 (3rd Cir.1996) (rejecting diversity in an educational setting as a compelling government interest), *cert. dismissed,* —— U.S. ——, 118 S.Ct. 595, 139 L.Ed.2d 431 (1997); *Lesage,* 158 F.3d at 215 ("Diversity is not a compelling State interest that satisfies the strict scrutiny standard for the purpose of admissions at a public university").

These courts view Justice Powell's *Bakke* opinion, along with various concurring opinions of other Justices, as nonbinding dicta. At least for Tracy's claim, the Court need not embrace *Hopwood* and disregard Justice Powell's *Bakke* opinion, since the instant policy could not survive under it in any event. In other words, the very authority upon which the NAACP relies to support its diversity argument undercuts it. Even if the NAACP's diversity goal constituted a compelling State interest, it travels only on generalizations, and is simply not narrowly tailored to serve that interest. *See Wessmann,* 160 F.3d at 797 ("If one is to limit consideration to generalities, any proponent of any notion of diversity could recite a similar litany of virtues").

Indeed, a majority of the *Bakke* court struck down an admission program which in several key respects is similar to UGA's admission policy. Justice Powell found that program, which focused solely on ethnicity, to be at odds with what he felt was a compelling interest in "genuine diversity." *Bakke,* 438 U.S. at 315, 98 S.Ct. 2733 (Powell, J., conc.). That admissions policy, described as a "dual admission program" or "two-track system," gave certain minority applicants (blacks, chicanos, asians, american indians) direct preferential treatment at the expense of other applicants. *Id.* at 274, 98 S.Ct. 2733.

The *Bakke* program never compared the preferred minority applicants to the other applicants. *Id.* at 275, 98 S.Ct. 2733. Instead, preferred minority applicants were allowed to compete for a select number of seats in the entering class while other applicants were not. *Id.* Also, preferred minority applicants were not subject to the minimum GPA requirements that non-minority applicants were required to meet. *Id.*

Justice Powell reasoned that the program's rigid preference for selected ethnic groups did little to foster "genuine diversity" of the type which he felt to be a compelling government interest. *Id.* at 315, 98 S.Ct. 2733. The diversity which he believed constituted a compelling government interest "encompasses a far broader array of qualifications and characteristics of which racial and ethnic origin is but a single though important element." *Id.* This diversity interest is not accomplished, he reasoned, by mechanistically guaranteeing that a certain percentage of a student body are members of preferred ethnic minorities. Indeed, he warned that such an approach "would hinder rather than further attainment of genuine diversity." *Id.*

Like the *Bakke* program, UGA's 1990–95 admission policy was "dual track." Doc. # 86 ¶ 4. It gave a direct benefit to black applicants at the expense of all other applicants. Black applicants were evaluated on an entirely different standard, with lower requirements for admission across the board. Minimum GPA, SAT and Academic Index requirements for blacks were lower than for non-black applicants. Black applicants were never compared against other applicants for the limited number of seats within UGA's freshman class. *Id.* at ¶ 7. Based upon these

explicit racial preferences—preferences more aggravated than those used in *Bakke,* where at least other minority groups also received preferential treatment [12]—black UGA applicants were accepted while non-black applicants with the same or better (objective) academic criteria were denied admission. *Id.* at ¶ 10.

Both the *Bakke* and UGA programs "focused *solely* on ethnic diversity" in making admission decisions. *Bakke,* 438 U.S. at 315, 98 S.Ct. 2733 (emphasis original). To that end, the Court agrees with Justice Powell that such a simplistic approach actually hinders the attainment of "genuine diversity." *Id.; supra* note 12. The diversity interest he defended in *Bakke* was not based solely on race or ethnicity, nor advanced by way of a simplistic, mechanical preference system. Thus, even if diversity is a compelling government interest, UGA failed to narrowly tailor its 1990–95 admission policy to further it.

### 3. *Interest in Remedying Past Discrimination*

The NAACP also argues that UGA enacted its admission policy to remedy the present effects of past UGA discrimination. Remediating past discrimination has been recognized as a compelling government interest. *Croson,* 488 U.S. at 500, 109 S.Ct. 706. But such remediation polices are appropriate only where there is a "strong basis in the evidence for [a government's] conclusion that remedial action [is] necessary." *Id.*

Furthermore, the racial classification must be in response to actual discrimination at the institution in question. *Wygant,* 476 U.S. at 274, 106 S.Ct. 1842 (Powell, J., plurality opinion) (There must be "some showing of prior discrimination by the governmental unit involved before allowing limited use of racial classifications in order to remedy such dis-

crimination"). Racial classification to remedy general, "societal discrimination" is simply not a compelling State interest. *Bakke,* 438 U.S. at 265, 98 S.Ct. 2733 (Powell, J., conc.); *see also Wessmann,* 160 F.3d at 807 ("When authorized by the Constitution, race-conscious remedies not only must respond to a compelling governmental interest, but also must be narrowly tailored to rectify the specific harms in question").

Because this remedial interest is widely accepted as compelling, satisfaction of this portion of the strict scrutiny test boils down to "the adequacy of the evidence of discrimination offered to show that interest." *Ensley Branch, N.A.A.C.P. v. Seibels,* 31 F.3d 1548, 1565 (11th Cir.1994) (internal quotations and citations omitted). "Without an adequate showing of discrimination, the government's assertion that affirmative action is necessary lacks credibility." *Id.; Croson,* 488 U.S. at 505, 109 S.Ct. 706.

So, the NAACP must support UGA's dual track admission policy by illuminating the "present effects of past discrimination." *Podberesky v. Kirwan,* 956 F.2d 52, 57 (4th Cir.1992). While the remedial justification for the admission policy was raised by the NAACP, doc. #156 at 19–21, no defendant has referred this Court to sufficient evidence demonstrating a " 'strong basis in evidence' showing that a current social ill in fact has been caused by such conduct." *Wessmann,* 160 F.3d at 800 (quoting *Croson,* 488 U.S. at 500, 109 S.Ct. 706). Indeed, the Board concedes that there was no compelling interest justifying this iteration of UGA's admission policy. Doc. # 86 at ¶ 27.

To support the contention that there exist present effects of past discrimination at UGA, the NAACP points to (1) the history of discrimination at UGA and other University System institutions; (2) racial discrimination at the primary and secondary school level;

---

**12.** Other minority groups enjoyed no such preference under UGA's policy, thus negating the very purpose of fostering "diversity." One surmises that university officials may have reasoned that the academic achievement bar need be lowered only for blacks to gain entrance. This "meat-ax" approach, which presumes lower achievement based solely on skin color, permits government officials unchecked power to apply statistical data and personal assumptions about a particular racial group's capabilities. Such race-counting cannot help but spawn race-based resentment, identity-group politics, and, in individual cases, nothing less than "a barefaced denial of equal protection." *People Who Care v. Rockford Bd. of Educ.,* 111 F.3d 528, 538 (7th Cir. 1997).

and (3) the fact that UGA attracts black students "at a rate 80% below their representation among Georgia high school graduates". Doc. # 156 at 19–21. For various reasons, none of these assertions are sufficient to satisfy *Croson*'s exacting standard. 488 U.S. at 500, 109 S.Ct. 706.

Past or present discrimination at other University System institutions or at the primary or secondary school level does not justify the use of racially discriminatory admissions at UGA. Because the admission policy at UGA is institution-specific, so must the purported reason for its existence (present effects of past discrimination) actually exist at UGA. To hold otherwise would allow for the remediation of "societal discrimination" by an institution otherwise free from the effects of past discrimination. Again, remedying "societal discrimination" is not a compelling interest. *Wygant*, 476 U.S. at 274–77, 106 S.Ct. 1842 (Powell, J., plurality opinion) ("[A]s the basis for imposing discriminatory *legal* remedies that work against innocent people, societal discrimination is insufficient and overexpansive") (emphasis original); *Bakke*, 438 U.S. at 265, 98 S.Ct. 2733.

The NAACP cites no record evidence which shows that the history of discrimination at UGA manifests *present* effects necessary to implement a racially discriminatory admission policy. *See* Doc. # 156 at 20 (citing 1 *Race Relations Reporter*, 968–69 (1956)). The Court recognizes that UGA, decades ago, engaged in segregative admissions. *See* McMillian dep. at 48–49. But such temporally remote *past* practices, without any connection to present discriminatory effects, are insufficient to warrant **current** racial discrimination in admissions. *Wessmann*, 160 F.3d at 802 (an "indiscriminate reliance on history alone ... permit[s] the adoption of remedial measures ageless in their reach into the past, and timeless in their ability to affect the future") (internal

quotes and citations omitted); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 239, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (Scalia, J., conc.) ("under our Constitution there can be no such thing as either a creditor or a debtor race").

The NAACP's "80% under-attraction" assertion (doc. # 156 at 20) is followed by no citation to record evidence and therefore will be disregarded here. *See Riley v. Newton*, 94 F.3d 632, 638 (11th Cir.1996).[13] Even if true, the fact that many black high school students choose, for some reason, not to apply to or attend UGA is not a reason for enacting a racially discriminatory admission policy. All such a statistic would show is black student disinterest for, or bias against, UGA.

Such disinterest and antipathy, the NAACP no doubt would argue, derives from UGA's history of past segregation. That cannot carry the day. "[M]ere knowledge of [and thus, minority group reaction to] a historical fact is not the kind of present effect that can justify a race exclusive remedy. If it were otherwise, as long as there are people who have access to history books, there will be programs such as this." *Podberesky v. Kirwan*, 38 F.3d 147, 154 (4th Cir.1994).

Put another way, a belief on the part of potential black students that they will not feel "comfortable" at UGA is not a present effect of past discrimination. *See* Albright dep. at 56. UGA long ago ended its segregationist practices and now actively recruits qualified black applicants. *Id.* at 54–57. Thus any problematic racial tension at UGA, or lack of a sufficient "comfort level", at most results from societal discrimination. *Podberesky*, 38 F.3d at 154–55. Again, race based classifications based merely upon a generalized interest in remedying societal discrimination are unconstitutional. *Cf.* note 12.

**13.** Although not cited by the NAACP, a UGA admissions official testified that the enrollment rate (the percentage of admitted students who choose to enroll at UGA) was about 10% lower for black students than non-black students. Albright dep. at 53. Although he attributed the difference in enrollment rates to a number of race neutral factors, Albright opined that some black students declined to enroll because they felt "uncomfortable." *Id.* at 56 ("This is both [from] surveys and from anecdotal evidence, talking to students both by me and other members of our admissions office. It starts with walking on campus and counting the number— this is an issue of race obviously—counting the number of faces that have the same skin tone as your face. There is a comfort level or a discomfort level based on that perception").

Tracy therefore is entitled to partial summary judgment against the Board for UGA's violation of his right to equal protection of law. The amount of his Title VI damages shall be resolved later in this case. As mentioned above, the Court also will resolve the injunctive-relief mootness issue in a forthcoming order.

## IV. CONCLUSION

Accordingly, the Defendant–Intervenors' Motion for Summary Judgement against Ashley Davis (doc. # 98) is **GRANTED.** Plaintiff Davis's Motion to Amend her complaint (doc. # 73) is **DENIED AS MOOT.** Plaintiff Kirby Tracy's motion for partial summary judgment (doc. # 73) is **GRANT-** **ED IN PART,** with his remaining claims **CARRIED WITH THE CASE.** Defendant–Intervenors' Cross–Motion for Summary Judgment against Kirby Tracy (doc. # 87) is **DENIED.** Defendant Board of Regents' Motion for Summary Judgment against all plaintiffs (doc. # 115) is (against Ashley Davis) **GRANTED** and (against Kirby Tracy) **DENIED.** The remainder of this motion is **CARRIED WITH THE CASE.**