PUBLISH

UNITED STATES COURT OF APPEALS

**Filed 10/21/96**

TENTH CIRCUIT

MARK WILSON and ANNE WALKER,

Plaintiffs-Appellants,

v.

No. 95-4056

GLENWOOD INTERMOUNTAIN
PROPERTIES, INC.; BRANBURY
PARK, INC.; DATA-PROP
MANAGEMENT, INC.; D. ROGER
CONRAD, BONNIE L. CONRAD;
DAVID E. NAGEL, BARBARA K.
NAGEL; KENT S. GILBERT; LANA R.
GILBERT; TAPP/SORENSEN
PARTNERSHIP; ELAINE M. MILLER;
JOHN E. KNUDSEN, GLEN C.
ROWLAND; KELLY W. ROMNEY
PARTNERSHIP,

Defendants-Appellees.

BRIGHAM YOUNG UNIVERSITY, a
Utah corporation,

Intervenor-Appellee.

Appeal from United States District Court
for the District of Utah
(D.C. No. 94-CV-745)

Bruce Plenk (Jensie L. Anderson with him on the brief), of American Civil Liberties
Union of Utah Foundation, Inc., of Salt Lake City, Utah, for the appellants.

Rex E. Lee, of Sidley & Austin, of Los Angeles, California (Mary Anne Q. Wood and
Kathryn O. Balmforth, of Wood, Quinn & Crapo, L.C., of Salt Lake City, Utah; Richard

M. Hymas of Nielsen and Senior, of Salt Lake City, Utah; Eugene H. Bramhall and David B. Thomas, of Brigham Young University, Salt Lake City, Utah, with him on the brief), for the appellees.

Before BALDOCK, EBEL, and BRISCOE, Circuit Judges.

BRISCOE, Circuit Judge.

Plaintiffs Mark Wilson and Anne Walker appeal from the district court's summary judgment order denying their claims that the defendant landlords violated the Fair Housing Act (42 U.S.C. §§ 3601-3631) by providing and advertising gender-segregated housing to students of Brigham Young University (BYU). Although the district court reached the merits after finding plaintiffs had standing to assert their gender discrimination claims, we conclude they do not have standing, vacate the district court's judgment on those claims, and remand with directions to dismiss plaintiffs' gender discrimination claims for lack of jurisdiction.

Brigham Young University requires unmarried students under 25 years of age to live in BYU-approved housing either on or off campus. All of the defendant landlords have been certified by BYU to provide BYU off-campus housing to unmarried BYU students. As a part of that certification, defendant landlords agreed (1) to rent their BYU-approved units only to unmarried BYU students, married BYU students, or student families; (2) to segregate students from non-students by buildings or wings of buildings if they are certified to rent to both students and non-students; (3) to rent only to unmarried male or unmarried female students or to separate unmarried male students from unmarried female students by buildings or wings of buildings if the landlords are certified to rent to both male and female BYU students; and (4) to use the most recent version of

2

the BYU-approved Student-Landlord Rental Agreement with all of their student renters. All of the defendant landlords own, operate, and advertise gender-segregated apartment buildings and wings for unmarried BYU students. Apartments in those buildings and wings are rented only to students, and none of the landlords segregate non-student renters by gender.

Wilson, an unmarried man under 25 years old who was not a BYU student, was denied apartments in off-campus BYU-approved student housing that was reserved for women. Walker, an unmarried woman under 25 years old who was not a BYU student, was denied apartments in off-campus BYU-approved student housing that was reserved for men. Plaintiffs brought this action against the defendant landlords for declaratory and injunctive relief, alleging defendants violated the Fair Housing Act by discriminating on the basis of religion, family status, and gender. BYU intervened as a defendant to defend its off-campus housing program.

The district court entered summary judgment in favor of defendants on all claims. On appeal, plaintiffs challenge only the denial of their gender discrimination claims. On these claims, the district court ruled that plaintiffs failed to establish a prima facie case of gender discrimination because, as non-students, they were not otherwise qualified for apartments reserved for students. The court also ruled that in any case defendants' practices were permitted under Title IX, 20 U.S.C. § 1686, which provides in pertinent part: "[N]othing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." As regards defendants' advertising of gender-segregated student apartments, the district court held if such gender segregation is lawful, then truthful

3

advertising which describes that practice cannot be unlawful.

We do not reach the merits because we conclude that plaintiffs lacked standing to bring the gender discrimination claims. Standing is a jurisdictional issue that may be raised by the court at any time. See National Organization for Women v. Scheidler, 114 S. Ct. 798, 802 (1994); FW/PBS v. City of Dallas, 493 U.S. 215, 229-32 (1990). The district court's finding that defendants conceded plaintiffs had standing to raise their gender discrimination claims is not determinative; parties cannot confer subject matter jurisdiction on the courts by agreement. See Laughlin v. Kmart Corp., 50 F.3d 871, 873 (10th Cir.); cert. denied 116 S.Ct. 174 (1995) (amount in controversy); Barhold v. Rodriguez, 863 F.2d 233, 234 (2d Cir. 1988) (standing). We review the standing issue de novo because standing is a question of law. See Mountain Side Mobile Estates Partnership v. Secretary of Housing and Urban Development, 56 F.3d 1243, 1249 (10th Cir. 1995).

Standing under the Fair Housing Act is as broad as permitted by Article III of the Constitution. See Havens Realty Corp. v. Coleman, 455 U.S. 363, 372 (1982); Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 209 (1972). To satisfy the Article III standing requirement, a party must establish three elements: (1) injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) likelihood that the injury will be redressed by a favorable decision. Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville, 508 U.S. 656, 663-64 (1993). Plaintiffs have not shown the required causal relationship or the likelihood that a favorable decision would redress the injury.

Plaintiffs claiming discrimination in the denial of a benefit need not show they

4

would have obtained the benefit in the absence of the discrimination to establish standing; it is enough to show the discrimination deprived them of the ability to compete for the benefit on an equal footing.  Northeastern Florida, 508 U.S. at 666-68.  See Adarand Constructors v. Pena, 115 S. Ct. 2097, 2104-05 (1995).  However, a person who fails to satisfy lawful, nondiscriminatory requirements or qualifications for the benefit lacks standing to raise claims of discrimination in the denial of the benefit.  The discrimination does not deprive the person of the ability to compete because he or she is disqualified from competing for other, legitimate reasons.  A favorable decision on the discrimination claim could not redress the injury because the person would still be disqualified from competing.  See Brunet v. City of Columbus, 1 F.3d 390, 398-99 (6th Cir. 1993), cert. denied 510 U.S. 1164 (1994) (male applicants who ranked too low to be eligible for hiring as firefighters lacked standing to challenge hiring of female applicants out of rank order); Donaghy v. City of Omaha, 933 F.2d 1448, 1455 (8th Cir. 1991), cert. denied 502 U.S. 1059 (1992) (white applicant for promotion to police lieutenant had standing to challenge promotion of minority officers out of rank order only after he would have ranked high enough to be considered for promotion if strict rank order had been followed); Bashir v. Supreme Court of Ohio, 652 F.2d 641 (6th Cir. 1981) (Pakistani attorney who sought admission to Ohio bar by motion lacked standing to challenge requirement of U.S. citizenship because he failed to satisfy requirement of admission to bar in another state); Doherty v. Rutgers School of Law-Newark, 651 F.2d 893, 899-902 (3d Cir. 1981) (unsuccessful white applicant for admission to law school lacked standing to challenge minority admissions program because he was not qualified for admission even in the absence of the minority admissions program).  See also Harris v. McRae, 448

5

U.S. 297, 320 (1980) (women who were neither pregnant nor eligible for Medicaid lacked standing to bring free exercise of religion challenge to legislation limiting use of federal Medicaid funds to pay for abortions); Fulani v. Bentsen, 35 F.3d 49, 54 (2d Cir. 1994) (presidential candidate excluded from televised debate co-sponsored by League of Women Voters and television network lacked standing to challenge League's tax-exempt status and eligibility to sponsor debate because network would have excluded candidate even if League lost tax-exempt status and eligibility as sponsor).  But see Price v. City of Charlotte, 93 F.3d 1241, 1245-48 (4th Cir. 1996) (white police officers who would not have been promoted even if city had not promoted lower-ranked minority officers had standing to seek damages for emotional distress over racial preference).  "[A] mere abstract denial of equal opportunity does not constitute injury in fact.  A general denial of equal opportunity does not confer standing on a particular individual unless that individual would have had access to the benefit at stake in the absence of discrimination." N.A.A.C.P., Boston Chapter v. Harris, 607 F.2d 514, 520 (1st Cir. 1979).  Discrimination cannot be the cause of injury to an applicant who could not have obtained the benefit even in the absence of the discrimination.

The Fair Housing Act does not make it unlawful for landlords to give preference to college students over non-students, and plaintiffs have not appealed the district court's denial of their claims that defendants' refusal to rent apartments to anyone other than BYU students constituted religious discrimination.  Because plaintiffs were not BYU students, the ownership and/or operation of gender-segregated apartments reserved solely for BYU students could not have caused plaintiffs to lose the opportunity to rent the apartments.  As non-students, plaintiffs lack standing to bring their gender discrimination

6

claims because even in the absence of the challenged gender discrimination they would not have qualified to rent the student apartments.

Further, a decision that defendants' ownership and/or operation of single-gender apartment buildings and wings for BYU students violated the Fair Housing Act would not redress plaintiffs' injury because they would still not be qualified to rent apartments reserved for BYU students. Plaintiffs lack standing to challenge defendants' rental practices because they do not "stand to profit in some personal interest" and lack a "personal stake" in the outcome. See Allen v. Wright, 468 U.S. 737, 766 (1984); Warth v. Seldin, 422 U.S. 490, 498 (1975).

Whether plaintiffs had standing to challenge defendants' advertising of the gender-segregated student apartments under 42 U.S.C. § 3604(c) is a closer question. Section 3604(c) makes it unlawful

> [t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

The record does not disclose the precise text of the advertisements, but the district court stated the three apartment complexes that rent only to male BYU students advertised their apartments were available only to male BYU students. The three complexes that rent only to female BYU students advertised their apartments were available only to female BYU students. The other seven complexes were approved for both male and female students, and four of those complexes rented only to BYU students. It was "undisputed that the Defendant Landlords advertise their apartments as BYU-approved for male and/or female students."

7

Advertisements for apartments approved for both male and female students do not indicate a gender preference and do not expressly disclose the apartments were gender-segregated so they do not clearly violate 42 U.S.C. § 3604(c), although anyone familiar with BYU housing policies would know the advertised apartments would be gender-segregated. However, advertisements for apartments available only to BYU students of one gender do indicate a preference, limitation, or discrimination.

Although these advertisements state the apartments are available only to students, plaintiffs' non-student status does not by itself determine standing to challenge the advertisements. The advertisements and not the refusals to rent are the statutory wrongs at issue. People may be subjected to discriminatory advertisements for apartments whether or not they are otherwise qualified or eligible to rent the apartments. Two courts have held that mere receipt of a discriminatory advertisement prohibited by the Fair Housing Act confers standing. See Ragin v. Harry Macklowe Real Estate Co., 6 F.3d 898, 904 (2d Cir. 1993); Saunders v. General Services Corp., 659 F. Supp. 1042, 1053 (E.D. Va. 1986). However, in Saunders, in addition to receipt of the advertisements, plaintiff also alleged the advertisements deterred her from considering living in any of defendant's properties.

Both Saunders and Ragin relied on Havens, 455 U.S. 363. In Havens, the Court held that testers working for a fair housing organization who did not intend to rent apartments for which they applied had standing to sue under 42 U.S.C. § 3604(d) for misrepresentations that apartments were unavailable when they were in fact available. 42 U.S.C. § 3604(d) makes it unlawful "[t]o represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available

8

for inspection, sale, or rental when such dwelling is in fact so available." The Court in Havens emphasized the statutory phrase "any person," and concluded the testers had standing because the actual or threatened injury required by Article III "may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'" 455 U.S. at 373. The court in Ragin found no significant difference between the statutorily recognized injury suffered by the testers in Havens and the injury sustained by readers of discriminatory advertising. 6 F. 3d at 904.

Under Ragin, and arguably Saunders, anyone who receives a discriminatory housing advertisement would have standing. Even non-students who see advertisements for apartments available only to students of one gender could have standing under these cases. However, in Spann v. Colonial Village, 899 F.2d 24, 29, n.2 (D.C. Cir.), cert. denied 498 U.S. 980 (1990), Judge Ginsburg expressed doubt that mere receipt of a discriminatory advertisement by plaintiffs could cause sufficient injury to establish standing under Article III:

> [W]e question whether Congress intended 804(c) [20 U.S.C. § 3604(c)] to confer a legal right on all individuals to be free from indignation and distress. But see Saunders, 659 F. Supp. at 1053 (mere receipt of preferential advertising violates statute and thus confers standing). We have no doubt, however, that an individual plaintiff who alleged and later proved that an advertisement indicating a racial preference deterred her from seeking housing in the advertised property would possess standing.[1]

Here, plaintiffs did not specifically allege they read the advertisements, but that

---

[1] The Fair Housing Act prohibits discriminatory advertising because "[w]idespread appearance of discriminatory advertisements in public or private media may reasonably be thought to have a harmful effect on the general aims of the Act; seeing large numbers of 'white only' advertisements in one part of a city may deter nonwhites from venturing to seek homes there." United States v. Hunter, 459 F.2d 204, 214 (4th Cir. 1972).

can be inferred from the allegations that defendants advertised a gender preference. Cf. Saunders, 659 F. Supp. at 1053 (fair housing organization lacked representational standing because there was no evidence of connection between challenged discriminatory advertisements and any of organization's members). Plaintiffs did not allege any other injury stemming from the advertisements. They did not allege the advertisements deterred them from seeking to rent the apartments; in fact, they applied to rent them. Resolving whether plaintiffs have standing to challenge defendants' discriminatory advertising therefore will require resolving whether plaintiffs' mere receipt of the advertisements is sufficient to confer standing. We conclude it is not.

Cases holding that mere receipt of a discriminatory advertisement is a sufficient injury to establish standing take Havens too far. We note that the Fair Housing Act provision at issue in Havens was 42 U.S.C. § 3604(d), which the Court concluded gives all persons a statutory right to truthful information about availability of housing because it expressly prohibits misrepresentations to "any person." 455 U.S. at 373. The provision at issue here is 42 U.S.C. § 3604(c), which prohibits discriminatory advertisements, but does not expressly state that advertisements and statements to "any person" are unlawful; the subsection does not designate to whom the statements must be made to be unlawful. Subsection (c) therefore does not give all persons an express statutory right to be free from discriminatory advertising.

Discriminatory advertising stigmatizes the discriminated-against group, and it is true that the stigmatizing injury often caused by racial discrimination can be sufficient in some circumstances to support standing. Allen, 468 U.S. at 755. In Smith v. City of Cleveland Heights, 760 F.2d 720 (6th Cir. 1985), cert. denied 474 U.S. 1056 (1986), the

10

defendant engaged in racial "steering" of black home buyers away from the city to maintain integrated neighborhoods. The plaintiff, a black resident of the city who was not himself subjected to steering, alleged the city's steering policies stigmatized him as a member of the group deemed undesirable by the city. The court concluded this was a sufficient injury to confer standing. 760 F.2d at 726-28. Arguably, the stigmatizing effect of gender discrimination in housing advertisements could be a sufficient injury to confer standing on persons who merely see the advertising.

However, we conclude that mere receipt by plaintiffs of the discriminatory advertisements in this case could cause only the kind of "abstract stigmatic injury" held insufficient to establish standing in Allen, 468 U.S. 737. In Allen, parents of black public school children contended IRS failed to carry out its obligation to deny tax-exempt status to racially discriminatory private schools. They asserted they were harmed by the mere fact of government aid to discriminatory private schools. The Court concluded stigmatic injury must be suffered as a direct result of having personally been denied equal treatment in order to confer standing. The Court explained that if the stigmatic injury were cognizable, standing would extend nationwide to all members of a racial group claiming unequal treatment, regardless of the location of the discriminatory school. "Recognition of standing in such circumstances would transform the federal courts into 'no more than a vehicle for the vindication of the value interests of concerned bystanders." 468 U.S. at 756 (quoting United States v. SCRAP, 412 U.S. 669, 687 (1973)).

Similarly here, if the stigmatic effect of a discriminatory advertisement were a sufficient injury, members of the discriminated-against group who read a discriminatory advertisement in the New York Times for example would have standing regardless of

11

whether they lived in New York City or on the West Coast, whether they had any interest in living in the advertised housing, and whether they met legitimate, nondiscriminatory qualifications for the housing. Persons who merely see a discriminatory advertisement are "concerned bystanders" who are not personally subjected to discrimination.

This is particularly true here because the advertising indicated the gender discrimination was directed only at students, and plaintiffs were not students. Plaintiffs were at most "concerned bystanders." Although a party may establish standing by raising claims of non-economic injury, "claims of injury that are purely abstract, even if they might be understood to lead to 'the psychological consequence presumably produced by observation of conduct with which one disagrees,' [citation omitted] do not provide the kind of particular, direct, and concrete injury that is necessary to confer standing to sue in the federal courts." ASARCO v. Kadish, 490 U.S. 605, 616 (1989) (quoting Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 485 (1982)).

By contrast, in Smith, the city's racial steering practices had a more concrete and personal effect on the plaintiff than mere receipt of discriminatory advertisements. As the court explained in Smith,

> Smith's relationship to the source and situs of his injury is far from attenuated or generalized. The source of his injury is a local governmental policy tailored expressly to shape the racial composition of his community. The situs is the very community in which he lives. These direct and concrete connections demonstrate that Smith's injury is "peculiar to himself or to a distinct group of which he is a part," [citation omitted], and that he is "personally subject to the challenged discrimination."

760 F.2d at 723. Accordingly, we conclude plaintiffs lacked standing to bring their claims that the discriminatory advertisements for BYU student housing violated the Fair

12

Housing Act.

The district court's entry of summary judgment in favor of defendants on the gender discrimination claims is VACATED, and this case is REMANDED to the district court with directions to dismiss plaintiffs' gender discrimination claims for lack of jurisdiction.