Kirby TRACY and Craig Green, Plaintiffs,

v.

BOARD OF REGENTS OF the UNIVERSITY SYSTEM OF GEORGIA and Dr. Stephen R. Portch, in his individual and official capacities, Defendants,

and

Georgia State Conference NAACP, et al., Intervenor Defendants.

No. CV 497–45.

United States District Court, S.D. Georgia, Savannah Division.

July 6, 1999.

A Lee Parks, Kirwan, Parks, Chesin & Miller, Atlanta, GA, K. Lee Adams, Parks, Chesin & Miller, PC, Atlanta, GA, Matthew C. Billips, Zimring, Smith, Billips, Atlanta, GA, for Michael C. Wooden, Terry Bratcher, Elizabeth Scarbrough, Thelma F. Richardson, Marie McConnell, Ruth Harris, Kirby Tracy, Tom Jarvis, Ashley Davis.

Dennis R. Dunn, Atlanta, GA, Alfred L. Evans, Jr., Sr. Asst. Atty. Gen., Atlanta, GA, for Board of Regents of the University System of Georgia, Stephen R. Portch.

John Mell Clark, Elberton, GA, Howard Eugene Alls, Howard E. Alls & Associates, P.C., Savannah, GA, E. Ronald Garnett, Augusta, GA, Dennis D. Parker, David T. Goldberg, Victor A. Bolden, Theodore M. Shaw, NAACP Legal Defense & Educational Fund, Inc., New York, NY, Ivory Kenneth Dious, Kenneth Dious & Assoc., Athens, GA, for Georgia State Conference NAACP, Southern Christian Leadership Conference, Neshanta Johnson, Adante Kwakye, Natalie Plowden.

## ORDER

EDENFIELD, District Judge.

### I. *INTRODUCTION*

Invoking 42 U.S.C. §§ 1981, 1983 and 2000d ("Title VI"), plaintiffs Craig Green

and Kirby Tracy challenge the University of Georgia's (UGA's) "affirmative action" admission policies. They contend that the Board of Regents of the University System of Georgia and Chancellor Stephen R. Portch (the Board) discriminated against them on the basis of their race (white) when they applied for admission to UGA's freshman class.

Prior orders detail the procedural history of this case. *See Wooden v. Board of Regents*, 32 F.Supp.2d 1370, 1372–75 (S.D.Ga.1999) (*"Wooden"*); doc. # 241. Here the Court will address the parties' cross-motions for summary judgment concerning Green. Doc. ## 192, 196, 201.

## II. *BACKGROUND*

Previously, this Court found UGA's 1990–1995 admission policy unconstitutional as applied to plaintiff Kirby Tracy, in that its blatant "race-counting" preference feature denied him his equal protection rights. *See Wooden*, 32 F.Supp.2d at 1378–84. UGA significantly changed that policy in 1996—before the instant case was filed—in light of concern over its constitutionality. Doc. # 86 ¶ 12 (Admission policy used from 1990–95 eliminated "because of growing concern of University of Georgia admission officials, in light of new Supreme Court decisions, about the constitutionality of its race-based, 'dual-track' admissions policy").

Green unsuccessfully sought admission to the Fall 1997 UGA freshman class. At that time UGA screened applicants at three levels: (1) Academic Index (AI); (2) Total Student Index (TSI); and (3) the "edge read" (ER). At the AI level, UGA applied objective academic criteria without regard to race or ethnicity and admitted approximately 88% of its 1997 freshman class. 12/10/98 Albright dep., exh. 11.

The AI's objective academic criteria consisted of a GPA–SAT (Grade Point Average—Scholastic Aptitude Test) score combination, which generates a numerical statistic known as the Academic Index. That statistic purports to predict an applicant's freshman year GPA. *Id.* at 13–14. At this initial AI stage, UGA automatically admitted applicants who met minimum SAT requirements and held an AI score above a set number. For the 1997 freshman class UGA set that number at 2.5, *id.*, exh. 11, while automatically eliminating from consideration those who fell below 2.25. *Id.*, exh. 11.

That left a group of students whose AIs fell between 2.25 and 2.5 to proceed to the TSI phase of consideration. For these students UGA calculated a Total Student Index (TSI) score by adding "bonus" points to their AIs (thus, the AI score plus bonus points = TSI score). *Id.*, exh. 10, 11. Those bonus points were based upon the following factors:

(a) academic (high SAT score, high GPA, difficult high school curriculum);

(b) demographic (self-identified ethnic/racial status, Georgia residency, male gender, parents' education level, alumni relatives); and

(c) extracurriculars (hours spent in extracurricular activities, summer work hours, school year work hours).

*Id.*, exh. 10; *see also Wooden*, 32 F.Supp.2d at 1375.

Each of these factors could add from .1 to .5 points. But UGA credited applicants who self-classified their race/ethnicity as non-caucasian (i.e., black, hispanic, native American, or asian) with .5 TSI points, while caucasian (white) applicants received none.[1] Doc. # 194 ¶ 13. For 1997, then, a non-white applicant could register up to an 8.46 TSI, while whites were capped at 7.96. 12/10/98 Albright dep., exh. 10.

After sorting applicants under the TSI process, UGA offered admission to all with

---

1. UGA changed its race-based numerical value from year to year. In 1997, it gave all non-caucasian applicants an additional .5 TSI points. Doc. # 194 ¶ 13. In 1996, using a similarly scaled TSI, it gave black applicants 1.75 TSI points, and hispanic and native American applicants .75 points. 7/1/98 Albright dep., exh. 1. Finally, while it gave asian applicants ethnic bonus points in 1997, it awarded none in 1996. *Id.*

a TSI score of 4.40 or higher. 12/10/98 Albright dep., exh. 6 at 7. Those below a 3.79 TSI score were eliminated outright. *Id.* Those scoring between 3.79 and 4.39. proceeded on to the final "edge read" (ER) stage of admissions. *Id.* However, the .5 point boost accorded non-whites meant that whites needed at least a 4.40 TSI score to be automatically admitted at this phase, while non-whites—solely because of the color of their skin—needed only a 3.90. Similarly, to avoid rejection at the TSI phase and proceed on to the ER phase, a white applicant needed at least 3.79 TSI points, while a non-white—because of the .5 racial/ethnic point boost—needed only 3.29.

At the ER stage, students with TSI scores between 3.79 and 4.39 had their application files individually read by at least two members of UGA's admissions office. *Id.* Here UGA discontinued its process of incrementally adding to a previous score, as it did when an applicant passed from the AI to the TSI phase. Instead, at the ER stage, all applicants started at zero. Edge readers then looked for qualities that might not have been apparent at the AI and TSI stages and scored all applicants on a −2.0 to +2.0 scale. *Id.* at 7–8. UGA then offered admission to all applicants with ER scores above a −.50, and denied it to those below that. 12/18/98 Albright dep. at 5.

Plaintiff Green's UGA application included a high school GPA of 3.3 and an SAT equivalency score (based upon his American College Testing (ACT) score of 27) of 1170–1190, resulting in an AI of 2.39. Doc. # 194 ¶¶ 8, 9. His AI score thus fell within the middle ground between automatic admission (AIs above 2.5) and automatic denial (AIs below 2.25). *Id.*

That sent Green's application to the TSI phase. UGA added 1.5 points for his parents' educational level, his Georgia residency, high GPA/SAT equivalency score and male gender, raising his TSI score to 3.89. *Id.* ¶ 11. Had he identified himself as non-white, however, his TSI score would have been 4.39. *Id.* ¶ 13.

Since Green's TSI score was below 4.40 (regardless of his race), his application proceeded to the ER stage. There two admissions counselors, acting as "edge readers," reviewed his application; both gave him a −2.0, the lowest possible score. 12/10/98 Albright dep., exh. 6 at 8. Because his score was below the −.50 cutoff, UGA denied Green's application. 12/18/98 Albright dep. at 5.

Green ultimately attended Dalton College that Fall, Green dep. at 15, but in 1998 he sought to transfer into UGA. *Id.* at 19. UGA denied his application because he lacked the necessary credit hours to transfer to UGA from a junior college. *Id.* at 20. Undaunted, Green intends to reapply as a transfer student once he earns the requisite credit hours. *Id.* at 16. The 1997 admissions process described above remains intact today. 12/10/98 Albright dep., exh. 8.

## III. *ANALYSIS*

### A. Cross–Motions for Summary Judgment on Green's Claims

■■■ As they have with every other plaintiff in this matter, the Board and the NAACP (for convenience, "the defendants") challenge Green's standing to bring this suit. As stated in *Wooden,* a plaintiff

> establishes standing by showing, first, that he has "suffered an 'injury in fact' —an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotations and citations omitted). He must also demonstrate a "*causal connection* between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant." *Id.* Finally, "it must be likely, as opposed to merely speculative that the injury will be redressed by a favorable decision."

32 F.Supp.2d at 1375 (emphasis added). That means that

individuals with merely "a generalized grievance against allegedly illegal government conduct" lack standing to sue in federal court. *U.S. v. Hays*, 515 U.S. 737, 743, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995). Thus, in the equal protection context, standing exists only for "those persons who are personally denied equal treatment by the challenged discriminatory conduct." *Allen v. Wright*, 468 U.S. 737, 755, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (internal quotations and citations omitted); *accord Wilson v. Glenwood Intermountain Properties, Inc.*, 98 F.3d 590, 593 (10th Cir.1996) ("a person who fails to satisfy lawful, nondiscriminatory requirements or qualifications for the benefit lacks standing to raise claims of discrimination in the denial of the benefit").

*Id.*

Here the parties focus on whether Green suffered an "injury-in-fact." While they agree that UGA took the ethnic/racial status of applicants into account through its TSI computation, they disagree on whether that amounted to a constitutionally sufficient injury in Green's case. Defendants insist that, because Green's race was not a factor in the ultimate decision to deny his application, he lacks standing to challenge UGA's admission policy. Doc. # 203 at 30; # 218 at 16–18; # 239 at 13–14. Even if Green had received the .5

bonus for "non-white" ethnic status at the TSI stage, they point out, his application still would have been relegated to the final (ER) admissions stage. *Id.*

Despite extensive discovery, Green has not been able to show that UGA racially classified applicants at the ER stage.[2] Hence, although UGA may have affirmatively considered his race at some point in the admissions process, the unrebutted evidence shows that its *final* decision to reject his application was not based on race. Nor did Green reach the final stage (i.e., had his file "edge read") *because* of his race. And every non-white applicant admitted at the TSI phase had a higher TSI score than Green did, even without the .5 bonus points.

But Green argues that he nevertheless has standing because UGA's admissions *process* (as opposed to its denial of admission) inflicted a constitutional injury upon him. Just having his application threaded through a process which employed race-counting (at the TSI stage), he contends, is enough. Doc. # 214 at 7. This argument has some appeal. For starters, the current iteration of UGA's admission policy— specifically the TSI phase—still relies in part on race.

To that extent, it parallels the 1990–95 affirmative action plan already held unconstitutional by this Court.[3] In addition,

**2.** While Green has shown that the edge readers engage in a subjective process, the record evidence permits no reasonable inference that race plays a factor at this stage. *See, e.g.,* doc. # 202 ¶ 4. One of the two "edge readers" for Green's application (the other could not be found, *see* 12/10/98 Albright dep. at 86–87) testified that, although she did not specifically remember reading Green's application, she never considered race when generating an ER rating. Allen dep. at 70.

To show some bias against white applicants, Green compares his application's "personal statement" to those minority students whom Allen "ER-screened" and UGA later admitted. He argues that these minority students' statements contained grammatical and spelling errors just like his statement, but Allen gave these students a higher ER score than Green. Doc. # 214 at 9–11. However, the personal statement was but one of several

factors Allen and other edge readers considered, and the Court declines Green's invitation to extensively compare his ER materials with minority students who received higher ER scores. The very nature of a subjective process, after all, inhibits detection of race-based decision-making. *See Ferron v. West*, 10 F.Supp.2d 1363, 1369–71 (S.D.Ga.1998). For that matter, even a cursory reading of the ER applicants' (including Green's) personal statements suggests regrettable writing deficiencies spread uniformly across all races.

**3.** Though the current plan purports to be a "plus," and not a "dual track" plan, establishing a quantifiable ethnic value along with a numerical basis for automatic admission simply amounts to a more complicated dual track system. In other words, it's still the same ship; UGA has simply rearranged the deck chairs.

1997 applicants at the TSI stage received automatic entry with a 4.4 or higher TSI score. 12/10/98 Albright dep., exh. 6 at 7. Yet, because non-whites received a .5 bonus or preference, then only whites were required to score a 4.4 to be automatically admitted, while non-whites needed only a 3.9.

Green has thus established that UGA gave non-whites an automatic advantage over *some* whites when competing for admission.[4] But does he not also have to show a causal connection between that and the constitutional injury he now alleges? In *Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville*, 508 U.S. 656, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993) ("*General Contractors*"), the Supreme Court held that an association of business general contractors had standing to raise an equal protection challenge to a municipality's race/gender-based set-aside contracting program. *Id.* at 668–69, 113 S.Ct. 2297.[5]

Yet—and Green pumps this point heavily—the contractors' association there failed to allege that any one of its members would have been awarded a contract but for the challenged ordinance. *Id.* at 664, 113 S.Ct. 2297. It in essence claimed that each of its members otherwise would have qualified to bid but for their failure to qualify with Jacksonville's minority-participation requirements. To force each member (for the sole purpose of establishing standing) to go to the expense of formally bidding, only to be rejected for failing to meet the challenged racial requirement, would be a gratuitous waste; it is thus enough that the set-aside program chilled off otherwise-qualified potential (white

male) bidders. Hence, "a party challenging a set-aside program like Jacksonville's need only demonstrate that it is *able and ready* to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." *Id.* at 666, 113 S.Ct. 2297 (emphasis added).

The *General Contractors* Court considered the everyday, practical realities of the public bidding process. It was entirely possible, for example, that once the program was stripped of the set-aside requirement, a minority-owned business could have tendered a successful bid and beat out majority-owned bidders—or vice versa. But the contractors' point was that no one would ever know given the racialism/genderism corrupting the bid process itself. Hence, the Court focused on the process's *structure*, rather than the particular *results* it might produce:

> [w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have attained the benefit but for the barrier in order to establish standing.

*Id.* (emphasis added).

■ Accordingly, "[t]he injury in fact in an equal protection case of this variety is the denial of equal treatment resulting from *the imposition of the barrier* [i.e., the structure itself], not the [result, i.e., the] ultimate inability to obtain the benefit." *Id.* (emphasis added). In other words, if the structure itself is tainted, why make the otherwise qualified run through it? *See*

---

4. Green therefore falls between the two previous "UGA" plaintiffs (Kirby Tracy and Ashley Davis) with respect to the "injury in fact" requirement. The Court previously held that Davis lacked standing because UGA rejected her application at the AI stage, *before* the ethnically/racially weighted TSI could be computed for her. *See Wooden*, 32 F.Supp.2d at 1375 (granting summary judgment to defendants because Davis "failed to point to any competent record evidence showing that UGA

considered her race when it rejected her"). In contrast, UGA not only applied its racial classification to Tracy, it would have admitted him were he black. *Id.* at 1374. Tracy's denial could thus be directly connected to UGA's impermissible racial classification. Green's case is closer to Davis's than Tracy's.

5. 10% of the funds spent on Jacksonville's contracts was required to go to minority and women-owned businesses. 508 U.S. at 658, 113 S.Ct. 2297.

*Rosenfeld v. Montgomery County Public Schools,* 41 F.Supp.2d. 581,· 584 (D.Md. 1999) (*General Contractors* "extended standing to plaintiffs claiming that their Equal Protection rights are violated when they are forced to compete in an admissions process *tainted* by unlawful racial preferencing") (emphasis added) (quotes and cites omitted).

But one must be "otherwise qualified." Green ultimately fails to show that he is and thus fit within the *"General Contractors"* zone of standing. There parties must show an ability to compete on an *equal footing* with minority groups but that, since the system itself is rigged against them based on race or some other constitutionally impermissible factor, they should not have to even bother submitting an application or bid. *See Lac Vieux Desert Band v. Michigan Gaming Control Bd.,* 172 F.3d 397, 406 (6th Cir.1999) ("a plaintiff need not make costly futile gestures simply to establish standing...."). It is enough to show that the taint within the process chills off *otherwise qualified* bidders:

> We note that ... [the plaintiff] Adarand need not demonstrate that it has been, or will be, the low bidder on a government contract. The injury in cases of this kind is that a discriminatory classification prevent[s] the plaintiff *from competing on an equal footing.* The aggrieved party need not allege that he would have obtained the benefit but for the barrier in order to establish standing.

*Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 211, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (citations and quotations omitted; emphasis added); *Hopwood v. State of Texas,* 999 F.Supp. 872, 883 n. 21 (W.D.Tex.1998) ("*Adarand* implicitly rec-

ognized that an individual's inability to compete **on an equal footing** as a result of discriminatory classifications is a harm that is related to the issue of standing") (emphasis added); *see also Lac Vieux,* 172 F.3d at 404–05 (bidder showed that it was capable of submitting a bid proposal, and it did not need to show that it would have won the bid).

All of these cases require Green to show that the system prevented him from competing on an equal footing. Green fails in this regard because he has not shown that he was *otherwise qualified* and then had his "bid" for admission subjected to a "tainted" admissions process. *Cf. Wooden,* 32 F.Supp.2d at 1374 (Tracy "indisputably would have satisfied the 'black' admissions criteria").

It is true that when Green applied, non-whites got a .5 TSI boost; but even if UGA had given Green that boost, it still would not have triggered application of the "race-counting," TSI-phase component *to him.* Every non-white applicant admitted at the TSI phase possessed a TSI score higher than Green's even *before* the addition of any ethnic/racial bonus points. Green therefore cannot say that he was prevented, because of his race, from competing *on an equal footing* with non-whites.

In that sense Green cannot show that "but for [UGA's] affirmative action program, he would have been considered for [admission]." *Stefanovic v. Univ. of Tenn.,* 173 F.3d 856, 1999 WL 196570, at * 3 (6th Cir.1999) (unpublished); *see also id.* at * 4 ("Even assuming that [plaintiff] suffered an actual injury by not being hired ... for the desired position, he still failed to demonstrate any *direct* relationship between the existence of an affirmative action program at [the university] and its decision not to offer him the desired position") (emphasis added).[6] Accordingly,

**6.** In *General Contractors,* the City of Jacksonville erected a barrier to majority bidders—a set-aside requirement conditioned solely on race or gender. The plaintiff organization therefore could clearly define its injury as its members' inability to compete on equal footing; they were able to trace the injury to the disputed preference and show that the elimi-

nation of it would redress that injury. *See General Contractors,* 508 U.S. at 666 n. 5, 113 S.Ct. 2297. Green cannot show that here because the "race-counting" component of the TSI phase was simply never applied to him; nor can he show that were he a favored minority he would have benefitted from it.

Green has not suffered an "injury-in-fact" sufficient to have standing to challenge UGA's admission policy on equal protection grounds.[7]

## B. "The Road Ahead"

■ The Court therefore cannot reach Green's claims because he lacks standing. However, it cannot go unnoticed that a mere 1/100th of a TSI point has spared UGA from judicial scrutiny, if not invalidation of, an admission policy that likely will be re-challenged in the near future.[8] Hence, the Court would be remiss if it didn't briefly note what the record evidence now compels: UGA cannot constitutionally justify the affirmative use of race in its admission decisions.

The record shows, quite simply, that at the upper TSI-score phase of its admissions process, UGA prefers one applicant over another based solely on race.[9] The primary justification for such race-counting—where non-white applicants literally are awarded "racial bonus points"—is UGA's cited need for "diversity." But that term has been stretched so far beyond its original judicial conception—a diverse student body may promote an "atmosphere of speculation, experiment and creation"[10]— that now its "meaning depends not only on time and place, but also upon the person uttering it." *Wessmann v. Gittens*, 160 F.3d 790, 796 (1st Cir.1998) ("The word 'diversity,' like any other abstract concept,

does not admit of permanent, concrete definition").

For example, some envision a "diverse" environment in non-racial terms, where various and conflicting ideas and beliefs conjoin to produce a dialectic which stimulates intellectual curiosity/inquiry/growth. *See* D. D'Souza & C. Edley, Jr., *Affirmative Action Debate: Should Race-based Affirmative Action Be Abandoned as a National Policy?*, 60 Albany L.Rev. 425, 461 (1996) (arguing that intellectual rather than cosmetic diversity should be a goal of college admissions).

In contrast, others contend that one's racial or ethnic identity takes precedence over any actual contribution to an atmosphere of speculation, experiment and creation. *See, e.g.*, K. Kennedy, *Race-exclusive Scholarships: Constitutional Vel Non*, 30 Wake Forest L.Rev. 759, 773 (1995) ("When university officials speak of achieving a diverse student body, they are not referring to the intellectual diversity that is so deeply rooted in the tradition of classical liberal thought. Instead, among the progressive professorate, diversity is viewed strictly in terms of race, ethnicity, and gender") (quotes and cites omitted).

In the meantime, the very concept of "diversity" has become so malleable that it can be instantly conscripted to march in any ideologue's army, *see* A. Kozinski, *Teetering on the High Wire*, 68 U.Colo. L.Rev. 1217, 1229 (1997) ("everyone likes

---

7. Green's interest in representing a class of other denied applicants does not save the day. *See Lewis v. Casey*, 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) ("[t]hat a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that the injury has been suffered by other, unidentified members of the class to which they belong and purport to represent").

8. Because the Court is not reaching the merits of Green's case, no res judicata can be applied against future challengers. Moreover, the evidence suggests that other potential plaintiffs with stronger "standing" grounds than Green exist and can start this

costly litigation cycle all over again. *See also* S.D.Ga. Local Rule 3.1. Meanwhile, the judicial winds continue to blow against UGA. *See, e.g., Hunt v. Cromartie*, — U.S. —, —, 119 S.Ct. 1545, 1548–49, 143 L.Ed.2d 731 (1999) ("Our decisions have established that all laws that classify citizens on the basis of race ... are constitutionally suspect and must be strictly scrutinized").

9. That is, of those whites and non-whites who score high enough to trigger application of the TSI's racial "bonus-point" system to them.

10. *See Univ. of Cal. Regents v. Bakke*, 438 U.S. 265, 312, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (Powell, J., conc.).

diversity, so long as it falls within a fairly narrow ideological range"), and exploited by government officials to avoid answering tough questions. *See* J. Chen, *Diversity in a Different Dimension: Evolutionary Theory and Affirmative Action's Destiny*, 59 Ohio St.L.J. 811, 815 (1998) (adherence to the diversity rationale "avoids all the hard issues that burden other racially tinged legal questions: racial responsibility, group rights, proportional racial representation, compensatory justice, innocent victims or even a social consensus about the magnitude of present discrimination") (quotes and cites omitted).

Even when affirmative action proponents decide on what "diversity" means, they fail to meaningfully show how it actually fosters educational benefits. *See* Note, *An Evidentiary Framework for Diversity as a Compelling Interest in Higher Education*, 109 Harv.L.Rev. 1357, 1362 (1996) ("sociologists confront tremendous difficulties in evaluating the impact of any factor, including diversity, on students in higher education"). At best one can cite to speculative cause and effect "evidence" that "X" number of blacks, hispanics, (etc.) in a given freshman class will somehow translate into a "better" academic environment. *See* Knapp aff. ¶¶ 11–14, 18, 36.

This much is certain: because the amorphous nature of the term "diversity" is so easily exploited, it can be readily misused to reach otherwise impermissible ends. Thus, while affirmative action proponents may hoist the familiar flag of "diversity," their true goal may lie in achieving constitutionally disfavored proportional representation (e.g. racial balancing). *See Wessmann*, 160 F.3d at 798 (defendant school's "flexible racial/ethnic guidelines appear to be less a means of attaining diversity in any constitutionally relevant sense and more a means for racial balancing"); *cf. Freeman v. Pitts*, 503 U.S. 467,

494, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992) ("Racial balance is not to be achieved for its own sake. It is to be pursued when racial imbalance has been caused by a constitutional violation").

The question then naturally arises: how can a State dole out race-based preferences when it cannot adequately define the compelling interest it seeks to serve? *See Lutheran Church–Missouri Synod v. F.C.C.*, 141 F.3d 344, 356 (D.C.Cir.1998) (definitional problem is "illustrative of just how much burden the term diversity has been asked to bear; [diversity] appears to have been coined as a permanent justification for policies seeking racial proportionalism in all walks of life ... and as a synonym for proportional representation itself"); *cf. Ho by Ho v. San Francisco Unified School District*, 147 F.3d 854, 864–65 (9th Cir.1998) ("how can a system that in fact does use racial classifications ... work rationally without knowing what the central classifying concept means?").

The racial preference component within UGA's TSI phase suffers from this "definitional drift." [11] Defendants insist that the preference leads to an increase in ethnic diversity, which, in turn, leads to a more diverse collection of thoughts, ideas and opinions on campus. Doc. # 201 at 11–12; doc. # 218 at 32–34; doc. # 221. Hence, an increase in the number of non-caucasian students will make it possible for all students at UGA "to derive the educational benefit that comes from direct exposure to peers from different backgrounds, whose experiences and points of view are different from their own or less different than assumed." Doc. # 221 at 31.

But such reasoning employs race as a "proxy," and equates a student's racial or ethnic status with a certain viewpoint or way of thinking which *might* contribute to

---

**11.** Plaintiffs' counsel pressed Chancellor Portch to justify UGA's use of racial preferences. Portch dep. at 32–33. Portch claimed that, because students will eventually work in a "multi-cultural" *employment* setting, they will benefit from a similar multi-cultural *edu-*cational setting. *Id.* When pressed to reveal whether he or his administration knew what that "multi-cultural" educational setting was supposed to "look like," however, he responded: "We don't." *Id.*

"diversity." *See* 7/1/98 Albright dep. at 58–59. In other words, State officials promote exactly what society neither needs nor tolerates: racial stereotyping, where government officials simply *assume* that blacks, for example, think one way, and whites another.[12]

Put another way, the use of a racial or ethnic proxy equates racial/ethnic status with a particular way of thinking, thus stereotyping students based on their race. Established jurisprudence forbids this. *See Miller v. Johnson*, 515 U.S. 900, 912, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) ("Race-based assignments embody stereotypes that treat individuals as the product of their race, *evaluating their thoughts and efforts* — their very worth as citizens — according to a criterion barred to the Government by history and the Constitution") (quotes and cites omitted, emphasis added); *cf. Roberts v. United States Jaycees*, 468 U.S. 609, 627–28, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) (Condemning legal decision-making that relies uncritically on an assumption that "women might have a different attitude about such issues as the federal budget, school prayer, voting rights and foreign relations").

Worse, UGA did not attempt to first use a race-neutral admission policy before employing the race-weighted TSI. It shifted from the aforementioned "dual track" admission policy to the current version without first ascertaining what effect *not* using a racial preference might have. *See* 7/1/98 Albright dep. at 62 ("We didn't think of not using race; [i]t never came up that we might not use race"). When it came to formulating its admission policy, UGA officials evidently employed racial preferences first and asked questions later.

Further, UGA's current admission policy stigmatizes non-white students, the vast majority of whom earned admission *without* the benefit of the TSI's racial preference.[13] 12/10/98 Albright dep., exh. 11. Adding insult to injury, the record also suggests a good possibility that the TSI's racial preference achieved at best only an insignificant increase in "racial diversity" at UGA. *See* 12/10/98 Albright dep. at 70 ("Q. If race was not used as a factor in admissions, would it reduce black enrollment? A. It may have. I haven't studied it. I assume it would reduce it some. I would think it would reduce it by a *handful* ") (emphasis added).

This jaw-dropping revelation suggests that UGA is willing to stigmatize its non-white students for the sake of a largely *symbolic* racial preference. This fact alone should force any reasonable decision-maker to reexamine, if only on simple practicality grounds, whether such racial preferences can be justified *at all.*

## IV. CONCLUSION

Accordingly, the defendant-intervenors' Motion for Summary Judgement against Craig Green (doc. # 196) is **GRANTED,** as is the defendants' Motion for Summary Judgment against Craig Green (doc. # 201). Plaintiff Green's Motion for partial Summary Judgment (doc. # 192) is

12. Q. [O]ne of the reasons that race is taken into account as a factor in admissions is because of the desire to have people of different backgrounds, opinions, beliefs, et cetera?
A. I believe that's true.
Q. All right. In the total student index is there any attempt to determine whether individuals *actually have* particular viewpoints as to the anticipation that they might have different viewpoints based on their race.
A. No.
7/1/98 Albright dep. at 58–59 (emphasis added).

13. *See Richmond v. J.A. Croson*, 488 U.S. 469, 493, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (O'Connor, J., conc.) ("Classifications based on race carry a danger of stigmatic harm"); *Fullilove v. Klutznick*, 448 U.S. 448, 533, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (Stewart, J., dissenting) (By allowing racial classifications, "[n]otions of 'racial entitlement' will be fostered, and private discrimination will necessarily be encouraged"); Chen, 59 Ohio St. L.J. at 901 (affirmative action's "heaviest burden falls upon exceptional nonwhite students. [Despite their superior credentials] ... these students cannot completely escape the label of inferiority that affirmative action slaps on entire groups").

*DENIED.* Plaintiff Green's case is *DISMISSED WITH PREJUDICE,* and all subsequent filings shall bear an appropriate caption. The Court will address the remaining issues in two companion orders.