KLAVER CONSTRUCTION CO., INC., a Kansas corporation, Plaintiff,

v.

KANSAS DEPARTMENT OF TRANS- PORTATION; United States Depart- ment of Transportation; E. Dean Carlson, in his capacity as the Kansas Secretary of Transportation; and Rodney E. Slater, in his capacity as the United States Secretary of Trans- portation, Defendants.

No. 99–2510–JAR.

United States District Court, D. Kansas.

July 15, 2002.

Kurt A. Harper, Sherwood & Harper, Wichita, KS, Thomas R. Olson, Amy R. Baudler, Kristine A. Kubes, Thomas R. Olson & Associates, St. Paul, MN, Kristine A. Kubes, Thomas R. Olson & Associates, St. Paul, MN, for Plaintiff.

Michael B. Rees, Oswald S. Dwyer, Office of Chief Counsel, Kansas Department of Transportation, Topeka, KS, Marybeth Martin, Jay D. Adelstein, U.S. Department of Justice Employment Litigation, Washington, DC, Melamie D. Carol, Office of United States Attorney, Kansas City, KS, Sonya A. Rao, U.S. Department of Justice Civil Rights Division, Washington, DC, for Defendants.

---

**1.** Pub.L. 105–178, 112 Stat. 107 (1998).

## ORDER GRANTING MOTIONS TO DISMISS.

ROBINSON, District Judge.

The Federal and State defendants have brought motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) for lack of standing (Doc. 117 and Doc. 124). Plaintiff Klaver Construction Co. ("Klaver") is challenging the constitutionality of the federal Disadvantaged Business Enterprise ("DBE") program and the Kansas Department of Transportation's ("KDOT") implementation of that program. Klaver seeks a permanent injunction against enforcement and a declaration of unconstitutionality of § 1101(b) of the Transportation Equity Act for the 21st Century[1] ("TEA–21"), 49 C.F.R. part 26 and the KDOT's DBE program which it alleges discriminates on the basis of race and gender in the award of federal-aid highway contracts in Kansas.

Klaver's Amended Complaint consists of four counts:

1) TEA–21 and 49 C.F.R. Part 26 are facially unconstitutional in that they contain impermissible race and gender classifications and preferences relating to the award of federal-aid highway contracts. The statute, regulations and Federal Defendants violate Klaver's rights under 42 U.S.C. § 2000d and the equal protection element of the Fifth Amendment to the United States Constitution.

2) TEA–21 and 49 C.F.R. Part 26, both facially and as applied, invidiously discriminate against white male-owned and controlled contractors, such as Klaver. The statute, regulations and the Federal Defendants violate Klaver's rights under 42 U.S.C. § 2000d and the equal protection element of the Fifth Amendment to the United States Constitution.

3) The relevant provisions of TEA–21 exceed Congress' legislative powers under the United States Constitution. They should be declared invalid and void as an improper exercise of Congress' power under the United States Constitution.

4) The DBE Program and the acts of the State Defendants violate Klaver's rights to equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution, § 1 of the Kansas Constitution, and 42 U.S.C. §§ 1981, 1983 and 2000d.

STATUTES/REGULATIONS:

TEA–21 governs federal appropriations to the states for various federal-aid highway programs. Section 1101(b) of TEA–21 sets forth spending requirements related to DBEs. This section provides in pertinent part that "[e]xcept to the extent that the Secretary determines otherwise, not less than 10 percent of the amounts made available for any program" under the Act "shall be expended with small business concerns owned and controlled by socially and economically disadvantaged individuals." [2]

The statute defines "small business concern" as having

the meaning such term has under section 3 of the Small Business Act (15 U.S.C. 632); except that such term shall not include any concern or group of concerns controlled by the same socially and economically disadvantaged individual or individuals which has average annual gross receipts over the preceding 3 fiscal years in excess of $16,000,000, as adjusted by the Secretary for inflation.[3]

USDOT has adjusted this figure for inflation, and the DBE program's average gross receipts cap now stands at $17.42 million.[4]

The statute defines "socially and economically disadvantaged individuals" as follows:

The term 'socially and economically disadvantaged individuals' has the meaning such term has under section 8(d) of the Small Business Act (15 U.S.C. 637(d)) and relevant subcontracting regulations promulgated pursuant thereto; except that women shall be presumed to be socially and economically disadvantaged individuals for the purposes of this subsection.[5]

Section 8(d) of the SBA provides in part:

[S]ocially and economically disadvantaged individuals include Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities, or any other individual found to be disadvantaged by the Administration pursuant to section 8(a) of the Small business Act.[6]

The Federal Defendants develop, administer, and enforce federal regulations to implement the DBE provisions of TEA–21. In 1999, the Federal Defendants adopted revised DBE regulations, which are codified in 49 C.F.R. Part 26. Under 49 C.F.R. Part 26, states receiving federal highway funds are required to adopt and administer DBE programs. If a state fails to implement and administer a DBE program pursuant to the federal DBE pro-

---

**2.** TEA–21 § 1101(b)(1).

**3.** TEA–21 § 1101(b)(2)(A).

**4.** Notice: Participation by Disadvantaged Business Enterprises in Department of Transportation Financial Assistance Programs; Inflationary Adjustment, 65 Fed.Reg. 52470 (August 29, 2000).

**5.** TEA–21 § 1101(b)(2)(B).

**6.** 15 U.S.C. § 637(d)(1).

gram guidelines, it forfeits all federal highway funding. Pursuant to the mandates of TEA–21, the federal DBE program under 49 C.F.R. Part 26 contains a 10% goal for DBE participation on federal-aid highway contracts. It requires that state recipients of federal funds set overall goals for DBE participation on federal-aid highway contracts. It requires states to rebuttably presume that women, Black Americans, Hispanic Americans, Native Americans, Asian–Pacific Americans, Subcontinent Asian Americans, or other minorities found disadvantaged by the SBA are socially and economically disadvantaged. It requires that applicants for DBE certification who are not presumed disadvantaged on the basis of minority or female status must prove, by a preponderance of the evidence, that they are socially and economically disadvantaged. Pursuant to 49 C.F.R. Part 26, applicants who are not presumed disadvantaged on the basis of their race or gender must produce evidence of the following:

(A) At least one objective distinguishing feature that has contributed to social disadvantage, such as race, ethnic origin, gender, disability, long-term residence in an environment isolated from the mainstream of American society, or other similar causes not common to individuals who are not socially disadvantaged.

(B) Personal experiences of substantial and chronic social disadvantage in American society, not in other countries; and

(C) Negative impact on entry into or advancement in the business world because of the disadvantage.

49 C.F.R. Part 26 directs that, to the extent feasible, state-recipients of federal highway funds attempt to meet their overall goals through the use of race and gender-neutral means, and to the extent they cannot, the state must utilize contract goals to meet its overall goal. On contracts with goals, prime contractors must meet the goal for DBE participation or otherwise document good faith efforts to meet the DBE goal. "Good faith efforts" require prime contractors to subcontract work to DBEs with higher quotes than non-DBEs.

*Facts:*

Based on the averments in Plaintiff's First Amended Complaint and Supplemental Complaint, the relevant facts are as follows:

Klaver, a Kansas corporation, is a highway contractor which specializes in building reinforced concrete box bridges, culverts and drainage-related structures. Klaver is owned and controlled by Caucasian males, and is not qualified as a DBE.

The Federal Defendants develop, administer, and enforce federal regulations to implement the DBE provisions of TEA–21. In 1999, the Federal Defendants adopted revised DBE regulations, which are codified in 49 C.F.R. Part 26.

The State Defendants adopted and administer a DBE Program which has been approved by the USDOT as being in compliance with 49 C.F.R. Part 26. The DBE Program requires that 9.8% of the dollar value of its federal-aid highway funds be performed by certified DBEs. Of this 9.8%, the State Defendants anticipate meeting 1% of their DBE goal through race and gender-neutral means, and 8.8% through the use of race and gender-conscious contract goals. Since the filing of the original complaint, KDOT has promulgated and implemented a revised DBE program for federal fiscal year 2001. The revised DBE Program establishes a 9.22% overall goal for DBE participation on federally-assisted highway contracts let in federal fiscal year 2001. KDOT has determined that it will attempt to meet .90% of

its overall goal through race and gender neutral means (e.g. a DBE obtains a subcontract because it submitted the lowest quote). KDOT implements and enforces race and gender conscious contract goals to meet the other 8.32% of its overall DBE participation goal. With respect to the use of race and gender-conscious contract goals, the State Defendants' DBE Program requires that prime contractors meet the goal for DBE participation at the time of their bid, or document that significant good faith efforts have been undertaken to meet the DBE goal. If a prime contractor fails to meet the goal or otherwise document significant good faith efforts to meet the goal, KDOT will not award the contract to that prime contractor. "Good faith efforts" require prime contractors to subcontract work to DBEs with higher quotes than non-DBEs.

On July 18, 2001, KDOT held a letting for, among other projects, two federal-aid state-tied projects identified as follows:

1. Project No.: 150–57 K 6777–01 (STP K 677(701))
 County: Marion
 Description: Grading, Bit. Surfacing, & Bridges

2. Project No. 150–9 K 5769–01 (STP K 576(901))
 County: Chase
 Description: Grading & Conc. Pavement

The Marion County project had a DBE participation goal of $600,000 and the Chase County project had a DBE participation goal of $700,000. Klaver submitted a subcontract quote to bidding prime contractors, including Wittwer, Inc. & Affiliates, for specified concrete work on both of the above-identified projects. Klaver's quote for the Marion County project was $103,927 lower than a quote for the same work by a DBE, Reece Construction Co., Inc. Klaver's quote for the Chase County project was $19,827 higher than Reece's quote for the same work. Overall, Klaver's quotes on both projects were $84,100 lower than Reece's quotes. Because of the DBE goals, Wittwer was forced to use Reece's quote for the work. KDOT awarded the project to Wittwer.

Klaver has lost subcontract work as a result of the DBE program promulgated by the State Defendants. KDOT will continue to let federal-aid highway contracts in Kansas, and at least some of those contracts will contain DBE participation goals. Klaver will bid on the federal-aid highway contracts in Kansas in federal fiscal year 2000 and the future.

Plaintiff has also stipulated to the following:

Plaintiff is not at least 51 percent owned by individuals who are socially and economically disadvantaged as the term "socially and economically disadvantaged" is defined in 49 C.F.R. Part 26. Plaintiff is not at least 51 percent owned by any firms that are owned by individuals who are socially and economically disadvantaged as the term "socially and economically disadvantaged" is defined in 49 C.F.R. Part 26. At least one of the owners of Klaver Construction Company, Inc. currently has, and at least one owner has had, a personal net worth that exceeds or has exceeded $750,000, as the term "personal net worth" is used in 49 C.F.R. Part 26. Plaintiff currently is, and has been since at least 1995, affiliated with Sherwood Construction Company, Inc., as the term "affiliation" is used in 49 C.F.R. Part 26. The combined average annual gross receipts, as the term average annual gross receipts is defined in 49 C.F.R. Part 26, of Klaver Construction Company Inc. and Sherwood Construction Company Inc., over the preceding three years and since at least 1995, have been in excess of $17.42 million. Plaintiff currently is not, and has not been since 1995, certified as a disadvantaged business enterprise, as the term "disadvantaged business enterprise" is defined in 49 C.F.R. Part 26, in the state of Kansas or in any other state of the United States.

Plaintiff currently cannot satisfy, and could not have satisfied since at least 1995, all of the criteria to be a disadvantaged business enterprise, as the term "disadvantaged business enterprise" is defined in 49 C.F.R. Part 26.

*Motion to Dismiss*

 The motions are brought pursuant to Fed.R.Civ.P. 12(b)(1) both as a facial and as applied challenge to Klaver's standing.[7] Where the motion challenges the *sufficiency* of plaintiff's allegations material to standing, those allegations must be accepted as true.[8] Where the motion presents a challenge to the facts upon which the subject matter jurisdiction depends, the court need not presume the truthfulness of the complaint's factual allegations and may decide factual issues based on evidentiary submissions by the parties in order to resolve disputed jurisdictional facts under Rule 12(b)(1).[9] However, Defendants have accepted Klaver's material allegations of fact as true for purposes of the motions to dismiss. All of the parties have submitted evidence outside of the pleadings.

*Standing:*

 Article III, § 2 of the U.S. Constitution limits the jurisdiction of federal courts to actual "cases" or "controversies."[10] Klaver, based on its complaint, must establish that it has standing.[11] More specifically, Klaver must demonstrate that it meets each of the following requirements:

1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;

2) the injury is fairly traceable to the challenged action of the defendant[s]; and

3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[12]

*Injury in Fact:*

 For purposes of this motion, the Court will assume that Klaver has adequately alleged that it has incurred an injury in fact. Klaver alleges that it regularly bids, and will continue to bid, for contracts associated with federally-assisted highway construction projects, and that the race- and gender-conscious aspects of the DBE program place it at a competitive disadvantage in bidding for those contracts. These assertions, along with Klaver's assertions that it has bid for and failed to win two contracts in August 2001, sufficiently allege the injury in fact of diminished competitiveness.[13] Klaver alleges that its failure to win the two contracts has caused it economic injury. If true, this allegation of economic injury alleges a ju-

**7.** *See Holt v. United States,* 46 F.3d 1000, 1002 (10th Cir.1995).

**8.** *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

**9.** *United Tribe of Shawnee Indians v. United States,* 253 F.3d 543, 547 (10th Cir.2001).

**10.** *Raines v. Byrd,* 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997).

**11.** *Id.* (citation omitted).

**12.** *Friends of the Earth, Inc. v. Laidlaw Env. Servs., Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *see also Schaffer v. Clinton,* 240 F.3d 878, 882 (10th Cir. 2001) (citations omitted).

**13.** *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 211, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (noting that the injury in cases of this kind is that a discriminatory classification prevents the plaintiff from competing on an equal footing).

dicially cognizable injury in fact.[14]

*Causation:*

■ Klaver must show that it suffered its alleged injuries "as a consequence of the alleged constitutional error."[15] Klaver cannot show that the specific aspects of the DBE program that it contends are unconstitutional have caused its alleged injuries. The direct cause of any injury it has suffered is the fact that it does not qualify as a disadvantaged small business because Klaver and its affiliate are too large and Klaver itself is owned and controlled by an individual who is too wealthy to qualify as economically disadvantaged. Neither of these factors relate to the program's race- or gender-conscious elements.

Klaver seeks to undermine the DBE program by asserting that it relies on "suspect" criteria, i.e., "race- and gender-based preferences." Klaver describes these "preferences" as the practice of setting goals for DBE participation on some projects. However, the practice is facially neutral because the DBE program requires only that qualifying firms be certified as disadvantaged, not that they be owned and run by individuals of a particular race or gender.[16] What renders these facially neutral practices potentially race- or gender-conscious is the fact that TEA–21 and its implementing regulations accord a rebuttable presumption of disadvantaged status to individuals who belong to certain groups that historically have been subjected to social and economic disadvantage.[17] Klaver must prove that the DBE program's partial reliance on these rebuttable presumptions is the cause of its injuries.[18] The presumptions create no bar to Klaver's participation in the DBE program because the program also includes an alternative method of demonstrating disadvantaged status that is open to Klaver and all contractors, regardless of the race and gender of the individuals who own and control those companies.[19]

Klaver argues that by requiring DBE applicants who are not presumed to be disadvantaged to prove social disadvantage on the basis of race, ethnicity or gender, 49 C.F.R. Part 26 distinguishes between contractors on the basis of race, ethnicity and gender and, in effect, creates an impermissible preference based on race, ethnicity and gender in the selection of DBEs. However, 49 C.F.R. Part 26 does not require proof of social disadvantage on the basis of race, ethnicity or gender, these are merely possible ways to prove social disadvantage. Individual determinations of social and economic disadvantage are provided for in 49 C.F.R. § 26.67(d) which provides that:

> Firms owned and controlled by individuals who are not presumed to be socially and economically disadvantaged (including individuals whose presumed disadvantage has been rebutted) may apply for DBE certification. You must make a case-by-case determination of whether

---

14. *Id.*

15. *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 485, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

16. 49 C.F.R. §§ 26.45, 26.51(d)-(e).

17. TEA–21 § 1101(b)(2); 49 C.F.R. § 26.67(a).

18. *See Cache Valley Elec. Co. v. State of Utah Dept. of Transp.,* 149 F.3d 1119, 1122–23 (10th Cir.1998), *cert. denied* 526 U.S. 1038, 119 S.Ct. 1333, 143 L.Ed.2d 498 (1999) (describing plaintiff's burden in similar challenge as one of showing that its injuries are " 'fairly traceable' to the disputed conduct of defendants—namely, the use of allegedly unconstitutional race and gender preferences").

19. 49 C.F.R. § 26.67(d).

each individual whose ownership and control are relied upon for DBE certification is socially and economically disadvantaged. In such a proceeding, the applicant firm has the burden of demonstrating to you, by a preponderance of the evidence, that the individuals who own and control it are socially and economically disadvantaged. An individual whose personal net worth exceeds $750,000 shall not be deemed to be economically disadvantaged. In making these determinations, use the guidance found in Appendix E of this part. You must require that applicants provide sufficient information to permit determinations under the guidance of Appendix E of this part.

Appendix E provides that:

. . . . .

I. Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias within American society because of their identities as members of groups and without regard to their individual qualities. Social disadvantage must stem from circumstances beyond their control. Evidence of individual social disadvantage must include the following elements:

(A) At least one objective distinguishing feature that has contributed to social disadvantage, such as race, ethnic origin, gender, disability, long-term residence in an environment isolated from the mainstream of American society, or other similar causes

not common to individuals who are not socially disadvantaged;

(B) Personal experiences of substantial and chronic social disadvantage in American society, not in other countries; and

(C) Negative impact on entry into or advancement in the business world because of the disadvantage. Recipients will consider any relevant evidence in assessing this element. In every case, however, recipients will consider education, employment and business history, where applicable, to see if the totality of circumstances shows disadvantage in entering into or advancing in the business world.

Appendix E goes on to provide considerations with regard to education, employment, and business history.

Other non-discriminatory criteria are the reason that Klaver is placed at a competitive disadvantage. Even if the rebuttable presumption of social disadvantage for certain racial minorities and women was removed, the TEA–21 DBE program would still exist as a small business program for socially and economically disadvantaged business owners with a personal net worth of less than $750,000.[20] TEA–21's personal net worth and size requirements are independent of the other requirements and are entirely race and gender-neutral. The existence of non-discriminatory criteria constitutes an independent cause that severs any causal nexus between the allegedly wrongful conduct and the plaintiff's injury.[21]

---

**20.** *See Cache Valley,* 149 F.3d at 1123 (recognizing that "the disputed preferences are severable from the rest of the DBE program and thus the program would remain viable even absent those preferences").

**21.** *See, e.g., Wilson v. Glenwood Intermountain Props., Inc.,* 98 F.3d 590, 593–94 (10th

Cir.1996) (citing numerous cases in support of the proposition that "[d]iscrimination cannot be the cause of injury to an applicant who could not have obtained the benefit even in the absence of discrimination"); *Interstate Traffic Control v. Beverage,* 101 F.Supp.2d 445, 451–53 (S.D.W.Va.2000) (holding that plaintiff similarly situated to Klaver failed to

Klaver has also alleged that the DBE program's rebuttable presumptions of disadvantaged status have caused its alleged injuries indirectly.[22] Klaver attempts to show that individuals are allowed to participate in the program who otherwise would be deemed ineligible. However, the showing is insufficient as set forth in the next discussion on redressability. Furthermore, the presumption of an individual's disadvantaged status is rebuttable and may be challenged by any person, including disappointed non-DBE contractors such as Klaver.[23] In addition, individuals eligible for a presumption of disadvantaged status must substantiate that presumption by attesting to their socially and economically disadvantaged status in a notarized statement, and to their personal net worth in a sworn declaration, and they are subject to a range of potential civil and criminal sanctions if they falsely certify that they are eligible for the program.[24] Certification authorities are required to conduct a detailed inquiry into the basis for a firm's assertion that it qualifies for the DBE program, including an onsite visit; interviews of key officers; and analysis of the firm's ownership documentation, financial capacity and work history.[25] DBE owners are required to attest annually in a sworn declaration that there have been no material changes in the firm's circumstances relevant to its eligibility to be cer-

tified as a DBE.[26] With these safeguards built into the DBE program, there is little prospect that a company such as Klaver could be injured by being required to compete against firms that are not truly disadvantaged. In *Interstate Traffic Control,* the court noted that:

> Under DBE regulations, the presumptive truth of disadvantage is then confirmed by dual certifications as to disadvantage and personal net worth. Having carefully considered the DBE eligibility determination process, the only way the Court can see that the rebuttable presumption of disadvantage could cause Interstate's injury would be if there were fraud in the program. Applicants presumed disadvantaged, but not, must be fraudulently misrepresenting their net worth. Interstate has made no allegation of fraud at all, much less with the particularity required by *Fed.R.Civ.P.* 9(b).[27]

*Redressability:*

Klaver also lacks standing because a favorable decision would not redress its alleged injuries. Even if the Court were to declare the rebuttable presumptions unconstitutional and enjoin their use, Klaver's alleged diminished competitiveness would not be materially altered because Klaver would still be ineligible to partici-

---

demonstrate its injury was caused by the DBE program's rebuttable presumptions); *SRS Technologies, Inc. v. U.S. Dept. of Defense,* No. 96–1484, 1997 WL 225979, * 1, 112 F.3d 510 (4th Cir.1997), *cert. denied* 522 U.S. 1046, 118 S.Ct. 687, 139 L.Ed.2d 634 (1998) (holding that the plaintiff lacked standing to challenge the racial presumption of disadvantaged status in a Small Business Administration contracting program because plaintiff was ineligible for that program for race-neutral reasons).

22. *See Allen v. Wright,* 468 U.S. 737, 757–59, 104 S.Ct. 3315, 82 L.Ed.2d 556 (holding plaintiffs failed to prove causation where nex-

us between allegedly unlawful program and impact on educational marketplace was attenuated and speculative).

23. 49 C.F.R. §§ 26.67(a)-(b), 26.87(a).

24. 49 C.F.R. §§ 26.67(a)(1)-(2), 26.83(c)(7)(ii), 26.107.

25. 49 C.F.R. § 26.83(c).

26. 49 C.F.R. § 26.83(j).

27. *Interstate Traffic Control,* 101 F.Supp.2d at 453.

pate in the DBE program for race- and gender-neutral reasons.[28]

■ The DBE program would continue even if the rebuttable presumptions were determined to be unconstitutional, and Klaver would continue to be ineligible to participate for race- and gender-neutral reasons.[29] There is a strong judicial policy against voiding statutes and whenever an act contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of the court to maintain the act in so far as it is valid.[30] When determining whether statutory language is "severable" from the rest of the Act, courts look first to whether the remaining statutory provisions are "fully operative" without the severed language—this means they determine whether the severed language is "functionally independent" from the remainder of the Act.[31] Since the DBE program concentrates on the disadvantaged, which can include white males, women and minorities, it includes race- and gender-neutral qualifications. These race- and gender-neutral requirements offer "distinct and separate" grounds upon which to base DBE qualification, thus ensuring that the race- and gender-conscious rebuttable presumptions are fully severable from the program. The severance of the rebuttable presumptions would not result in a total frustration of Congress' basic purpose in enacting TEA–21. The basic intent of the DBE program is to foster the growth of small businesses—whether owned by minorities, women, or white males.[32]

■ In *Cache Valley*, the Tenth Circuit found that Congress would have enacted the legislation regardless of the allegedly impermissible goal of favoring minority- and women-owned businesses.[33] Klaver argues that the race and gender provisions are not severable and distinguishes *Cache Valley* because the legislation at issue was ISTEA, the predecessor to TEA–21. Klaver argues that prior to enacting TEA–21, Congress undertook the "most thorough" debate in which it has engaged since the beginning of the DBE program,[34] and therefore the Court cannot rely on the 10th Circuit's assessment of the background of ISTEA, but must independently evaluate the legislative history of TEA–21 to determine if the race and gender provisions are severable. Klaver argues that the legislative history of TEA–21 strongly indicates that Congress would not have enacted the DBE program without the

**28.** *See, e.g., Wilson,* 98 F.3d at 593–94 (holding that elimination of allegedly discriminatory eligibility criteria would not redress injury of denial of equal opportunity to compete where individuals would remain ineligible for benefit for nondiscriminatory reasons).

**29.** *See, e.g., Interstate Traffic Control,* 101 F.Supp.2d at 452 ("the legislative intent 'to foster development in small businesses whose owners have had to overcome social and economic hardship would remain even in the absence of the challenged presumption' ") (citation omitted).

**30.** *Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 684, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987) (citations omitted).

**31.** *Bd. Of Natural Resources of the State of Washington v. Brown,* 992 F.2d 937, 948 (9th Cir.1993).

**32.** *See Cache Valley,* 149 F.3d at 1123; *See also,* Mrs. Meek (Fla.), *Building Efficient Surface Transportation and Equity Act of 1998,* 144 Cong. Rec. H1885–04, April 1, 1998 at *H2008 (stating that the bill is not all for minorities and women, it is for the "disadvantaged").

**33.** *Cache Valley,* 149 F.3d at 1122–23.

**34.** *See Participation by Disadvantaged Business Enterprises in Department of Transportation Programs,* 64 Fed.Reg. 21, 5096, 5101 (1999).

race and gender preferences challenged by Klaver. Klaver argues that the only debates involving the DBE program concerned proposed race-neutral amendments to the DBE provisions at issue. The Senate rejected a proposed amendment, entitled "Emerging Business Enterprise Program" which was designed to assist small, emerging businesses in obtaining federal-aid highway contracts. Klaver argues that the debates over the amendment and the ultimate rejection of a DBE program without race and gender preferences, establish that Congress considers the race and gender preference provisions integral to the DBE program. Similarly, the House rejected a proposed amendment to the DBE program to eliminate the race and gender preferences. Klaver acknowledges that the language of the two statutes are virtually identical. The legislative history of the DBE provision of TEA–21 incorporates the history of all preceding DBE transportation legislation, including IS-TEA. A statute should be interpreted in light of "that to which it gave rise as well as that which gave rise to it." [35] Congress can rely on expertise and information acquired from consideration and enactment of earlier legislation because "[a]fter Congress has legislated repeatedly in an area of national concern, its Members gain experience" in that area.[36]

The fact that Congress rejected the amendments sheds no light on whether those in Congress who favored the DBE program would have enacted the program independently of the rebuttable presumptions. Rather, the debates involving the proposed amendments demonstrate only that, when faced with the choice between

authorizing a DBE program that included the rebuttable presumptions and one that did not, Congress chose the former. It does not follow that Congress would not have enacted the DBE program if faced with the choice between a DBE program without the rebuttable presumptions and no DBE program whatsoever. As the Tenth Circuit stated in *Cache Valley:*

> ... [I]t is clear that the legislative intent [of ISTEA] to foster development in small businesses whose owners have had to overcome social and economic hardship would remain even in the absence of the challenged presumption.[37]

The purpose and intent of TEA–21 is also to foster the development of small businesses whose owners have suffered disadvantage. As the purpose and legislative intent behind TEA–21 is the same as that of ISTEA, the Tenth Circuit's reasoning in *Cache Valley* is equally applicable to TEA–21.

In arguing against severance, Klaver also points out that it is also challenging the allegedly "race-neutral" criteria for DBE certification, which it claims is anything but race-neutral. However, the Court has already addressed this issue with regard to causation, and found that 49 C.F.R. Part 26 does not require proof of social disadvantage on the basis of race or gender, these are merely possible ways to prove social disadvantage. Other means include ethnic origin, disability, long-term residence in an environment isolated from the mainstream of American society, or other similar causes not common to individuals who are not socially disadvantaged.

---

**35.** *United States v. Thompson/Center Arms Co.,* 504 U.S. 505, 516 n. 8, 112 S.Ct. 2102, 119 L.Ed.2d 308 (1992) (citation omitted).

**36.** *Fullilove v. Klutznick,* 448 U.S. 448, 503, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), *over-*

*ruled on other grounds, Adarand Constrs., Inc. v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).

**37.** 149 F.3d at 1123–24.

After finding the presumptions to be severable, the Tenth Circuit in *Cache Valley* noted that a party may nonetheless establish standing by demonstrating that a favorable judicial determination would "likely" improve the terms of competition it faces. To do this, the party would have to show at a bare minimum that the "practical effect of eliminating the presumption would be some meaningful reduction in the number of DBEs against which it would be forced to compete." [38] Klaver has attempted to make this showing.

Klaver has not demonstrated that there would be a material change in the competition Klaver faces from DBEs even if this Court were to strike the race-and gender-conscious aspects of the DBE program. Klaver argues that it has discovered evidence that the elimination of the race and gender preferences would meaningfully improve its terms of competition against DBEs. Klaver alleges that but for one disabled white male, every DBE currently certified by KDOT was certified solely on the basis of the presumptions of disadvantage for minorities and women set forth in TEA–21. Klaver argues that three of the four DBEs against which it competes cannot prove social disadvantage under the standards set forth in Appendix E to 49 C.F.R. 26. Klaver argues that KDOT would reduce the race-conscious goals on KDOT contracts if the number of DBEs currently certified by KDOT decreased. Klaver then submits evidence attempting to show that Mary Lou Reece (Reece Construction Co.), Jenette Phannenstiel (J. Corp.), and Robert McCormick, Jr. (McCormick Construction) cannot prove social disadvantage. Klaver argues that the DBE certification of Reece Construction alone greatly impacts Klaver's ability to compete equally for federal-aid contracts in Kansas. Klaver also alleges that

because it would take a substantial amount of time and effort for those claiming social disadvantage to actually prove it, elimination of the presumption would at least greatly reduce the number of DBEs for a substantial period of time and even a temporary reduction in the number of DBEs would redress its injuries.

However, Sandra E. Greenwell, the External EEO Officer for the KDOT, and the person responsible for administration of the Kansas DBE program, stated that she had read the transcripts of depositions taken for the three DBEs and the depositions do not contain sufficient information to demonstrate that any of the firms are not socially disadvantaged and therefore would be decertified from the KDOT DBE program. She stated that the information in the deposition transcripts is not sufficient evidence, standing alone, to make a decertification decision. She also stated that there are at least nine DBE firms currently certified by KDOT that perform work similar to the type of work performed by Klaver (concrete structures and/or box culverts). Reece Construction is the only DBE listed in the DBE directory as performing the type of work performed by Klaver. There are at least twenty-eight DBE firms currently certified by KDOT that perform general concrete work that may be related to the type of work performed by Klaver. All three of the DBEs referred to above perform general concrete work.

Joseph Austin is the Chief of the External Policy and Program Development Division of the Office of Civil Rights, US-DOT. That Division is responsible for adjudicating appeals relating to denials of DBE certification by a USDOT recipient. In addition to adjudicating appeals and issuing final administrative decisions, the

---

**38.** *Cache Valley,* 149 F.3d at 1124.

Division determines the validity of appeals of denial of certification or improper certification under the DBE program, provides training to recipients on certification procedures, and conducts outreach efforts to the small business community to inform individuals and businesses of their rights under 49 C.F.R. Part 23 and 26. Likewise, Mr. Austin read the transcripts of the depositions of the three DBEs and found that in his opinion the transcripts do not contain sufficient information to demonstrate that they are not socially disadvantaged and that therefore their firms would be ineligible for the DBE program if the presumption for social disadvantage was eliminated from the KDOT program. Defendants also submitted affidavits from the three DBEs stating that if the presumption of social disadvantage was eliminated, they would continue to seek inclusion in the KDOT DBE program and believe that they would continue to be eligible.

Klaver has failed to show that its injury is fairly traceable to the rebuttable presumptions or that an order striking the presumptions would redress its competitiveness-related injuries. The motions to dismiss filed by the Federal and State Defendants shall be granted.

**IT IS THEREFORE ORDERED BY THE COURT** that the motions to dismiss filed by the Federal and State Defendants shall be GRANTED.

IT IS SO ORDERED.